FACTS ............................................................................................................ 2

I.    DICARLO FORMS RELYNET AS SOLE PROPRIETORSHIP ............................ 2

II.    ADLER DEVELOPS ZERFORUM SOFTWARE FOR USE ON RELYNET'S

SITE HONDA-TECH.COM. ................................................................................... 3

III.    DICARLO INCORPORATES RELYNET AND RELYNET HIRES ADLER. ........ 5

IV.    ADLER NOTIFIES DICARLO THAT HE WILL LEAVE RELYNET IF HE IS

NOT PAID 49% OF THE COMPANY. .................................................................. 6

V.    ADLER IS FIRED AFTER SABOTAGING RELYNET'S COMPUTER

SERVERS. ............................................................................................................ 7

ARGUMENT .................................................................................................... 8

I.    LEGAL STANDARD FOR SUMMARY JUDGMENT ......................................... 8

II.    ADLER'S COPYRIGHT INFRINGEMENT CLAIMS FAIL AS A MATTER OF

LAW..................................................................................................................... 9

A.    Adler Cannot Sue For Infringement Because The ZeroForum Software Was A
"Work Made For Hire" Belonging To RelyNet. ......................................................... 9

1.    Adler Indisputably Wrote and Published The Latter Two Registered Works In
The Course Of Employment With RelyNet. ............................................................ 10

2.    Adler Was An Employee Within The Meaning Of Community for *Creative
Non-Violence v. Reid* When He Wrote The First 2.0.5a Siva Software...................... 12

3.    Adler Cannot Assert A Claim For Copyright Infringement Of Software That
RelyNet Owns or Co-Owns..................................................................................... 14

B.    Adler Voluntarily Relinquished, For Compensation, All Versions Of The
Software To RelyNet For Its Use With Its Customers, And Therefore Waived His
Right To Sue For Infringement. ............................................................................... 14

1.    Adler's Infringement Claims Are Barred By The Doctrine Of Waiver. ........... 15

2.    Adler's Infringement Claims Are Barred By The Doctrine Of Estoppel. ......... 15

3.    Adler's Infringement Claims Are Barred By The Doctrine Of Implied License.
16

C.    Adler's Claims For Copyright Infringement Against Defendants VW Vortex and
Intermedia Are Not Based Upon Actionable Infringing Conduct. .............................. 17

V.    ADLER'S CLAIM FOR FRAUD MUST FAIL.................................................. 18

   A.    Adler's Claim For Fraud Is Barred By The Three-Year Statute Of Limitations .. 19

   B.    The 2005 Letter Agreement, On Its Face, Cannot Support A Claim For Fraud .. 20

   C.    The 2005 Letter Agreement Waived His Fraud Claim......................................... 21

   D.    The Undisputed Facts Show That Adler Did Not Detrimentally Rely Upon DiCarlo's Alleged "Promise." .......................................................................... 22

     1.    Adler In Fact Did Not Believe DiCarlo Would Keep His "Promise." .............. 22

     2.    By His Own Admissions, Adler's Reliance Could Not Have Been Reasonable. 23

     3.    Adler In Fact Did Not Rely Upon The Letter Agreement To His Detriment Or Injury. ............................................................................................................ 24

CONCLUSION ............................................................................................................. 25

## Cases

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) ................................................................. 9

*Andrews Farms v. Calcot, Ltd.,* 527 F. Supp. 2d 1239, 1250 (E.D. Cal. 2007) .................................. 19

*Asset Marketing Systems, Inc. v. Gagnon,* 542 F.3d 748, 754 (9th Cir. 2008) ................................... 17

*Avtec Systems, Inc. v. Pfeiffer,* 21 F.3d 568 (4th Cir. 1994) ............................................................. 10

*Bagdasarian v. Gragdon,* 31 Cal. 2d 744, 751-752 (1948) ............................................................... 21

*Bob's Big Boy Family Restaurants v. N.L.R.B.,* 625 F.2d 850, 854 (9th Cir.1980) ............................. 16

Cal. Civ. Code §1709, 1710 ................................................................................................................ 19

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) ........................................................................... 9

*City Solutions, Inc. v. Clear Channel Communications,* 365 F.3d 835, 840 (9th Cir. 2004) ................ 23

*Community for Creative Non-Violence v. Reid,* 490 U.S. 730, 737 (1989) ..................................... 10, 13

*Community for Creative Non-Violence v. Reid,* 490 U.S. 730, 751-752 (1989) .................................. 13

*Conrad v. Bank of America,* 45 Cal. App. 4th 133, 157 (1996) ......................................................... 22

*Costar Group, Inc. v. Loopnet, Inc.,* 373 F.3d 544, 550-551, 555 (4th Cir. 2004) ............................ 18

*Creative Non-Violence v. Reid,* 490 U.S. 730 (1989) ....................................................................... 13

*Effects Assocs., Inc. v. Cohen,* 908 F.2d 555, 558 (9th Cir. 1990) ............................................... 16, 17

*Effects Assocs., Inc. v. Cohen,* 908 F.2d 555, 558 (9th Cir.1990) ..................................................... 16

*Feist Publ'ns, Inc. v. Rural Tel. Service Co.,* 499 U.S. 340, 361 (1991) ............................................. 9

*Gilpin v. Siebert,* 419 F.Supp.2d 1288, 1295 (D. Ore. 2006) ........................................................... 11

*Gilpin v. Siebert,* 419 F.Supp.2d 1288,1295 (D. Ore. 2006) ............................................................. 10

*Guido v. Koopman,* 1 Cal.App.4th 837, 843, 2 Cal.Rptr.2d 437 (1991) ............................................ 23

*Hilton Int'l Co. v. NLRB,* 690 F.2d 318, 321 (2d Cir. 1982) ............................................................. 13

*Krieger v. Nick Alexander Imports, Inc.,* 234 Cal.App.3d 205, 219 (1991) ....................................... 19

*Lazar v. Superior Court,* 12 Cal. 4th 631, 638 (1996) ...................................................................... 19

*Lin-Brook Builders Hardware v. Gertler,* 352 F.2d 298 (9th Cir. 1965) ............................................ 13

*Marshall v. Miles Lab., Inc.,* 647 F.Supp. 1326, 1330 (N.D. Ind.1986) ............................................ 11

*May v. Morganelli-Heumann & Associates,* 618 F.2d 1363, 1368 (9th Cir. 1980) ............................. 10

*Micro Star v. Formgen, Inc.,* 154 F.3d 1107, 1114 (9th Cir.1998) .................................................... 15

*Miller v. CP Chems., Inc.,* 808 F.Supp. 1238, 1242-44 (D.S.C.1992) .................................................... 11

*Napster, Inc. Copyright Litigation,* 479 F.3d 1078, 1096 (9th Cir. 2007) ............................................. 19

*Oakland Raiders v. Oakland-Alameda County Coliseum, Inc.,* 144 Cal. App. 4th 1175, 1186, 51 Cal. Rptr. 3d 144, 151 (2006) ........................................................................................................................................................ 21

*Oddo v. Ries,* 743 F.2d 630, 632-634 (9th Cir. 1984) ............................................................................ 17

*Picture Music, Inc. v. Bourne, Inc.,* 314 F. Supp. 640, 646 (S.D.N.Y. 1970) ....................................... 14

*Religious Technology Center v. Netcom Online Communication Center,* 907 F. Supp. 1361, 1369-70 (N.D. Cal. 1995). 17

*Rice v. Fox Broad. Co.,* 330 F.3d 1170, 1174 (9th Cir.2003) .................................................................. 9

*Schmidt v. Mesmer,* 116 Cal. 267, 270-271 (1897) ............................................................................... 21

*Service by Medallion, Inc. v. Clorox Co.,* 44 Cal. App. 4th 1807, 1818 (1996) .................................... 24

*Shaul v. Cherry Valley-Springfield Cent. School Dist.,* 363 F.3d 177, 186 (2d Cir. 2004) .................. 10

*Simplified Info. Sys., Inc.,* 89 B.R. 538, 542 (W.D.Pa.1988) ................................................................. 11

*Small v. Fritz Cos., Inc.,* 30 Cal.4th 167, 132 Cal.Rptr.2d 490, 65 P.3d 1255, 1258 (2003) ............... 19

*SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.,* 211 F.3d 21, 25 (2d Cir.2000) ..................... 16

*Soliman v. Philip Morris Inc.,* 311 F.3d 966, 975 (9th Cir. 2002) ......................................................... 22

*United States v. King Features Entm't, Inc.,* 843 F.2d 394, 399 (9th Cir.1988) .................................... 15

*Ward v. Atlantic Coast Line R. Co.,* 362 U.S. 396, 400, 80 S.Ct., at 792 (1960) ................................. 13

## Statutes

Cal. Civ. Code §3333 .............................................................................................................................. 24

## Rules

17 U.S.C. §101 ......................................................................................................................................... 9

17 U.S.C. §201 ....................................................................................................................................... 10

Cal. Civ. Proc. Code §338 ...................................................................................................................... 19

Fed. R. Civ. P. 56 ................................................................................................................................. 8, 9

Fed. R. Civ. P. 56(b) ............................................................................................................................... 8

*Terranova v. Terranova,* 883 F. Supp. 1273, 1281 (W.D. Wis. 1995) ................................................... 19

POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1   STEPHEN L. DAVIS (State Bar No. 149817)
    MARK R. LEONARD (State Bar No. 219186)
2   DAVIS & LEONARD, LLP
    8880 Cal Center Drive, Suite 180
3   Sacramento, California 95826
    Telephone: (916) 362-9000
4   Fax: (916) 362-9066
    E-mail: sdavis@davisandleonard.com
5
6   Attorneys for Defendants
    RelyNet, Inc. and Michael DiCarlo
7
8                  **UNITED STATES DISTRICT COURT**
9            **FOR THE EASTERN DISTRICT OF CALIFORNIA**
10
11  DUSTIN K. ADLER, an individual,          CASE NO. 2-08-CV-01333-JAM-EFB
12         Plaintiff,                        **MEMORANDUM OF POINTS AND**
                                             **AUTHORITIES IN SUPPORT OF**
13      v.                                   **MOTION BY DEFENDANTS' AND**
                                             **COUNTERCLAIMANTS RELYNET,**
14  RELYNET, INC. a California corporation and   **INC. AND MICHAEL DICARLO FOR**
    MICHAEL DICARLO, an individual,          **SUMMARY JUDGMENT OR SUMMARY**
15  INTERNET BRANDS, INC., a Delaware        **ADJUDICATION**
    Corporation, INTERMEDIA OUTDOORS,
16  INC., a Delaware Corporation, VORTEX     Date:      November 4, 2009
    MEDIA GROUP, INC., a Delaware            Time:      9:00 a.m.
17  Corporation and DOES 1 through 50,       Courtroom: 6
    inclusively,
18
           Defendants.
19  _____
20  RELYNET, INC., a California Corporation,
    MICHAEL DICARLO, an individual,
21
22         Counterclaimants,
23      v.
24  DUSTIN K. ADLER, an individual,
25         Counterdefendant.
    _____
26
27        Plaintiff Dustin Adler's complaint is a longstanding grievance in search of a
28  cognizable legal theory.  Since at least sometime in 2002 Adler had asked and expected

    defendant Michael DiCarlo to make him a partner, shareholder, or owner (neither his

                                    1

1   pleadings nor his testimony ever make this clear) in DiCarlo's Internet web-hosting

2   business, RelyNet, but DiCarlo never did so.  Many years after his repeated requests were

3   first made to and denied by DiCarlo, Adler has filed not just one, but two,  lawsuits against

4   DiCarlo and RelyNet, seeking what he believes he has been due for many years.  This

5   lawsuit sounds in fraud and copyright infringement.  The other, a companion lawsuit filed

6   in state court, seeks declaratory relief enforcing an alleged June 2005 contract between

7   Adler and DiCarlo.

8         All of Adler's claims founder on the simple, undisputed facts of this case.  Adler

9   was an employee of defendant RelyNet, Inc.  There is not a particle of evidence that he

10   was ever a shareholder or partner in the RelyNet business, whether he wanted to be one or

11   not.  His "copyrighted" software was a work made for hire belonging to RelyNet, so his

12   copyright claims must fail as a matter of law.  The facts disprove his claim that DiCarlo

13   ever made any false statements or promises upon which Adler ever relied.  As a matter of

14   law, his claims fail and defendants are entitled to summary judgment.

15

16                           **FACTS**

17   I.      DICARLO FORMS RELYNET AS SOLE PROPRIETORSHIP

18         Plaintiff Dustin Adler and Defendant Michael DiCarlo were childhood friends.

19   Both attended Capital Christian School in Sacramento. Depo. 14:1-10; DiCarlo Decl. ¶.

20   Both of them developed an early interest in computers and the Internet. AC ¶25[1]; Depo.

21   14:1-15:25. In about 1998, DiCarlo formed RelyNet. AC ¶25. Its original business was to

22   host customer's web sites. In 1999, DiCarlo briefly took a partner named Tim Roberts, but

23   he purchased Roberts' interest back the same year, and from the end of 1999 on RelyNet

24   was a sole proprietorship owned by DiCarlo. AC ¶25, 27; DiCarlo Decl. ¶3; Depo. 47:20-

25

26   ————————————

27   [1] Admissions in the opposing party's pleadings (even if unverified) are admissible evidence, Fed. R. Ev. 801(d)(2), and therefore can serve as the basis for summary judgment or opposition. *Lockwood v. Wolf Corp.*, 629 F.2d 603, 611 (9th Cir. 1980)

28   (summary judgment affirmed; party's pleadings are admissible as admissions for purposes of summary judgment).

1   48:22. DiCarlo filed a fictitious business name statement with the County of Sacramento,

2   identifying Relynet as a sole proprietorship owned by himself. At its inception RelyNet

3   operated out of DiCarlo's apartment, and later out of his house. DiCarlo Decl. ¶3. He

4   opened a bank account at with himself as the sole authorized signatory. Decl. ¶3; Depo.

5   55:21-56:4. He purchased RelyNet's equipment and negotiated and signed its leases for

6   office space. DiCarlo Decl. ¶3.

7       Adler was not involved in RelyNet at its beginning. In 1999 Adler obtained

8   employment as a software developer with a company called Objective Systems Integrators

9   ("OSI") in Folsom, California in June 2000, and then worked at several different other jobs

10  as a software developer. AC ¶29. While working as a programmer at OSI Adler

11  understood that his employer owned the software that he developed for it. Depo. 16:24-

12  17:10.

13      Although Adler claims that he became a "partner" in the RelyNet business

14  sometime in 2001, by virtue of the contribution of his "labor and expense in developing the

15  ZeroForum software and related intellectual property that powers RelyNet's servers," there

16  is no evidence whatsoever that DiCarlo ever transferred, or that Adler ever purchased, any

17  share or interest in the RelyNet business, or that either DiCarlo or Adler ever reported to

18  any tax or government agency that Relynet was a partnership or that Adler was a partner.

19  DiCarlo ¶3. Adler admits that he and DiCarlo never entered a written partnership

20  agreement. Depo. 49:19-50:10.

21

22  II.   ADLER DEVELOPS ZERFORUM SOFTWARE FOR USE ON RELYNET'S
         SITE HONDA-TECH.COM.
23

24      Adler and DiCarlo shared an interest in Honda automobiles as well as computers.

25  In 2000 Adler and DiCarlo discovered that a popular Internet message board for Honda

26  enthusiasts, then known as Honda-Acura.net, was going to lose its web hosting. AC¶30.

27  DiCarlo decided that RelyNet could host Honda-Acura.net. RelyNet took over the hosting

28  of Honda-Acura.net, and from that site it formed a new site Honda-Acura.Rely.Net.

1    DiCarlo subsequently renamed and registered the site with the domain name Honda-

2    Tech.com.  DiCarlo Decl. ¶5.

3          Internet bulletin boards (also known as message boards), such as the Honda-

4    Acura.net message board, provide an electronic forum in which participants share

5    information and dialogue regarding a topic of interest.  The Honda-Acura.net bulletin

6    board community comprised a forum of automobile enthusiasts interested particularly in

7    Honda and Acura vehicles.  Website bulletin board forums are "hosted" on one or more

8    "servers", which provide an operational platform for functional bulletin board websites by

9    performing services for connected clients (i.e., websites) as part of a client-server

10   architecture.  DiCarlo Decl. ¶6; AC ¶31.

11         Originally, RelyNet used commercial software program called Ultimate Bulletin

12   Board (UBB) to operate the Honda-Tech.com.  DiCarlo ¶7.  But in early 2000, while he

13   was still an employee with OSI, Adler developed the initial versions of a new message

14   board software program that he and DiCarlo decided to call "ZeroForum." DiCarlo ¶7.  By

15   his own admission, Adler saw this as an "opportunity to engage more fully his Honda car

16   *hobby*." AC 8:10-12 (emphasis added).  By June 2000, RelyNet, with Adler's knowledge

17   and consent, replaced the UBB software with an early version of ZeroForum to power the

18   Honda-Tech.com website.  AC ¶38.  RelyNet subsequently began hosting other message

19   boards using ZeroForum software; these included message boards for defendant VW

20   Vortex and the predecessor to defendant Intermedia, Prime Media.  Depo. 59:16-60:22;

21   80:14-81:10.  Adler was at all times aware that RelyNet was hosting these customers'

22   message boards, with up-to-date versions of ZeroForum software.  Depo. 59:16-60:22;

23   86:15-87:20; 88:4-89:12; 93:3-95:5.  Adler was often responsible for helping set them up

24   using the ZeroForum software.  Depo. 95:13-96:3; 103:10-22.  Adler never asserted

25   personal ownership over the software, never required anyone to license it from himself,

26   and never demanded a license fee for its use.  Depo. 87:22-88:3; 95:24-96:15; 105:12-

27   106:20.  He never used a copyright notice with his own name.  Depo. 89:18-90:20.

28   RelyNet, not Adler, received ad revenue from advertising space that DiCarlo, not Adler,

1  sold on the Honda-Tech.com site.  Although the total amount of revenue earned from

2  advertising during this period was small -- less than a few thousand dollars -- DiCarlo

3  directed a portion of the advertising revenues to Adler as compensation for his work for

4  RelyNet.  DiCarlo ¶9; Depo. 56:12-58:12.

5        From the beginning, Adler never used the ZeroForum software for any purpose

6  other than for RelyNet's message board hosting, or for the hosting of RelyNet customers.

7  DiCarlo Decl. ¶8; Depo. 91:6-93:2; 95:6-95:12.  After he was terminated from RelyNet in

8  August 2005, he never used the software or attempted to sell it or license it to anyone.

9  Depo. 110:23-113:18.  When he opened a new message board site, htuner, he used a new

10  software he had developed from scratch. Depo. 27:25-29:17.

11

12  III.    DICARLO INCORPORATES RELYNET AND RELYNET HIRES ADLER.

13        In late 2002, with RelyNet's message board business beginning to grow, DiCarlo

14  decided to incorporate RelyNet, and he incorporated RelyNet, Inc. in October 2002.

15  DiCarlo ¶10.  Adler was aware as of October 2002 that DiCarlo had formed RelyNet, Inc.

16  Depo. 67:17-69:6.  He wanted to be made a formal shareholder, and as early as December

17  2003 asked to be made a shareholder, but DiCarlo never transferred any shares to him.

18  Depo. 69:7-72:3; 73:1-74:24.  In his tax returns, DiCarlo treated RelyNet, Inc. as an S

19  corporation, and he consistently reported himself as the 100% shareholder of RelyNet.

20  DiCarlo Decl. ¶11 & Ex. B.  DiCarlo was at all times the sole officer and director of

21  RelyNet.  DiCarlo Decl. ¶10, 11 & Ex. A.  To DiCarlo's knowledge Adler never regarded

22  himself as a shareholder of RelyNet, Inc., never held himself out as a shareholder of

23  RelyNet, Inc., and never reported himself on any filing with any governmental agency as a

24  shareholder of RelyNet, Inc.  DiCarlo Decl. ¶11.

25        In January 2003 Adler signed a W-4 form and formally joined the payroll of

26  Relynet, Inc. as an employee.  Depo. 24:20-25; DiCarlo Decl. ¶14.  RelyNet hired Adler

27  and DiCarlo as employees.  *Id.* & Ex. C.  Adler claims that he and DiCarlo agreed that they

28  would receive the same amount of compensation in recognition of being equal owners of

1   the business; DiCarlo disputes Adler's account.  On some occasions Adler requested that

2   he be paid more money, and DiCarlo did so.  DiCarlo ¶15; Depo. 71:15-74:23.  Adler

3   testified that on multiple occasions he discovered that RelyNet was paying DiCarlo more

4   and that he complained about this fact to DiCarlo: in 2003, in 2004, and again around

5   March 2005.  Depo. 71:15-74:24.

6

7   IV.    ADLER NOTIFIES DICARLO THAT HE WILL LEAVE RELYNET IF HE IS
            NOT PAID 49% OF THE COMPANY.
8

9          After finding out for the third time in early 2005 that DiCarlo had been paying

10  himself more than Adler, Adler claims he grew increasingly frustrated with DiCarlo's

11  refusal to transfer an interest in the company to him.  Depo. 147:6-153:13.  By June 8,

12  2005 he admits he was forming a "backup plan" to remove the software from RelyNet's

13  servers so neither RelyNet nor DiCarlo could use it anymore.  Depo. 161:13-163:22.

14  Adler's frustration culminated in his drafting a letter to DiCarlo and presenting it to

15  DiCarlo on June 15, 2005.  AC ¶82; DiCarlo Decl. ¶30 & Ex. H; Depo. 163:24-170:25.  In

16  this letter, Adler made the following statements, among others:

17         "I have no stake in RelyNet.  I own 0% of it.  You own it all.  We have talked many

18  times about this, and you still refuse to yield to me what I am owed."

19         "I've had enough of the lies, the false promises, and the disrespect.  Every time I

20  have a 'talk' with you, I pray and hope that all the issues get resolved.  But they never do.

21  You never change, Mike."

22         "You have hence made it all-to-clear that the only bargaining tool I have is my

23  continued employment. . . . I formally request that 49% of RelyNet shares be issued to me .

24  . . by the date 1/1/2006. . . . If these shares are not issued to me by 1/1/2006, I am

25  discontinuing my employment with RelyNet."

26         "A letter is attached detailing the specifics, and I am formally requesting your

27  signature on the document."

28         DiCarlo Decl.¶30, Ex. H.  The second page of the letter contained only two lines:

1    "I, Michael DiCarlo, agree to issue 49% of RelyNet company stock to Dustin Adler

2    by the date 1/1/2006.

3        I understand that if this deadline is not met, Dustin Adler will be terminating his

4    employment with RelyNet."

5        DiCarlo signed the June 15, 2005 letter agreement on June 21, 2005.  DiCarlo Decl.

6    ¶30; Depo. 173:22-174:9; 178:4-7.  His understanding of the letter agreement, which was

7    drafted entirely by Adler, Depo. 169:2-4, was that Adler was seeking DiCarlo's

8    acknowledgment that Adler would quit RelyNet, Inc. if DiCarlo did not transfer 49% of

9    RelyNet's shares of stock to Adler by January 1, 2005.  DiCarlo did not believe he was

10    contractually bound by this letter to pay Adler these shares of stock, nor did he ever intend

11    to issue the shares of stock to Adler.  DiCarlo Decl. ¶30.

12        After DiCarlo signed the letter agreement and returned a copy to Adler, nothing

13    changed.  Adler continued working for RelyNet, Inc.  DiCarlo Decl. ¶31.  At the time he

14    presented the letter to DiCarlo he admits he was not seeking employment elsewhere, and

15    did not have any offers to work anywhere else.  Depo. 153:18-154:15.  Adler did not in

16    any way change his conduct or behavior in response to DiCarlo's signing the letter

17    agreement.  He continued to be paid as an employee of RelyNet, Inc.  DiCarlo Decl. ¶31.

18

19    V.    ADLER IS FIRED AFTER SABOTAGING RELYNET'S COMPUTER
          SERVERS.
20

21        In July 2005, DiCarlo discovered that Adler had accessed RelyNet computer

22    servers, and, without RelyNet's authorization, had deleted a file containing the history of

23    every command issued by the Administrator account.  It was evident to DiCarlo that Adler

24    did this to remove evidence of corrupting the ZeroForum software and customer database

25    backups on the RelyNet servers.  DiCarlo Decl. ¶32.  DiCarlo found a log file that showed

26    that Adler had issued commands to delete data and corrupt software and customer backup

27    data.  DiCarlo Decl. ¶32.  Had I not caught this problem and dealt with it RelyNet and its

28    customers could have been unable to recover from data loss.  The computers were,

1    indisputably, the property of RelyNet. DiCarlo Decl. ¶32. Adler admits in deposition that

2    he did this, and he further admits that he did so because in the event he left the

3    employment of RelyNet, Inc. he wanted to prevent RelyNet and DiCarlo from using "his"

4    ZeroForum software. Depo. ¶190:9-192:10.

5        DiCarlo enlisted the assistance of another RelyNet employee, Layton Wedgeworth,

6    to investigate the deletion of data, to find out what had been deleted, and to secure

7    RelyNet's computers from further sabotage by changing its passwords. DiCarlo Decl. ¶33.

8        DiCarlo decided, because of Adler's sabotage, that Adler's employment had to be

9    terminated, and on August 1, 2005 RelyNet, Inc. terminated Adler's employment. DiCarlo

10   Decl. ¶34.

11       Shortly after being terminated, Adler apparently retained counsel and promptly

12   filed the copyright registrations at issue in this case. AC¶65; Davis Decl., Exs. H, I, J. On

13   October 21, 2005 Adler's counsel, John Costello, sent a demand letter to DiCarlo claiming

14   Adler's alleged rights in the copyrights. DiCarlo Decl. ¶39 & Ex. K.

15       In January 2007 RelyNet agreed to sell all of its rights in the Honda-Tech.com

16   message board and domain name to defendant Internet Brands, Inc. As part of the sale, it

17   granted a nonexclusive license to Internet Brands to use the ZeroForum software to operate

18   the message board. DiCarlo Decl. ¶38 & Ex. J.

19

20                                    **ARGUMENT**

21   I.    LEGAL STANDARD FOR SUMMARY JUDGMENT

22       Rule 56 of the Federal Rules of Civil Procedure provides that a party "against

23   whom relief is sought may move at any time…for summary judgment on all or part of the

24   claim." Fed. R. Civ. P. 56(b). The court shall grant a motion for summary judgment if

25   "the pleadings, depositions, answers to interrogatories, and admissions on file, together

26   with the affidavits, if any, show that there is no genuine issue as to any material fact and

27   that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

28   Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty*

1  *Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  A dispute as to a material fact is genuine only if

2  there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving

3  party.  *See id.*  "Rule 56(c) mandates the entry of summary judgment...against a party

4  who fails to make a showing sufficient to establish the existence of an element essential to

5  that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*

6  *Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

7

8  II.    ADLER'S COPYRIGHT INFRINGEMENT CLAIMS FAIL AS A MATTER OF
9         LAW.

10         To establish infringement, "two elements must be proven: (1) ownership of a valid

11  copyright, and (2) copying of constituent elements of the work that are original." *Rice v.*

12  *Fox Broad. Co.,* 330 F.3d 1170, 1174 (9th Cir.2003) (citing *Feist Publ'ns, Inc. v. Rural*

13  *Tel. Service Co.,* 499 U.S. 340, 361 (1991)).  In this suit Adler claims ownership of three

14  versions of ZeroForum message board software: version 2.0.5a Siva, which was completed

15  and published in 2002; version 2.0.6c, which was completed and published in 2003, and

16  version 2.1.2, which was completed and published in 2005.  Davis Decl. Exs. H, I, J; AC

17  ¶65.  He claims that defendants DiCarlo and RelyNet, Inc., as well as RelyNet, Inc.'s

18  customers, Intermedia and VW Vortex, as well as the purchaser of Honda-Tech.com,

19  Internet Brands, have infringed his software, at least since the termination of his

20  employment on August 1, 2005.

21         Adler's claims fail however, because he can establish neither of the required

22  elements RelyNet, not Adler, is the owner of the software, and at the very least is the

23  owner of the latter two versions of the software; and Adler cannot allege actionable

24  conduct against at least some of the defendants.  Moreover, to the extent he ever owned the

25  rights in the software he long ago gave up those rights to Relynet, Inc.

26

27         A.    Adler Cannot Sue For Infringement Because The ZeroForum Software Was
              A "Work Made For Hire" Belonging To RelyNet.
28

9

1    A copyrightable work that is created by an employee within the scope of his

2  employment is deemed to be a "work made for hire" under the Copyright law.   17 U.S.C.

3  §101.  For copyright purposes, the author and owner of a "work made for hire" is the

4  employer.  17 U.S.C. §201(b);  *Community for Creative Non-Violence v. Reid*, 490 U.S.

5  730, 737 (1989).  On a copyright infringement claim, a work is prepared within the scope

6  of one's employment, for the purpose of considering whether a work was "made for hire,"

7  if: (1) it is the kind of work the author is employed to perform; (2) the creation of the work

8  occurred substantially within authorized work hours and space; and (3) the creation of the

9  work was actuated, at least in part, by a purpose to serve the employer. *Gilpin v. Siebert*,

10  419 F.Supp.2d 1288,1295 (D. Ore. 2006).  When an employer hires an employee or

11  independent contractor to produce works of an artistic nature, courts will presume in the

12  absence of contrary proof that the parties expected the employer to own the copyright and

13  that the artist set his price accordingly.  *May v. Morganelli-Heumann & Associates*, 618

14  F.2d 1363, 1368 (9th Cir. 1980); *see Shaul v. Cherry Valley-Springfield Cent. School Dist.*,

15  363 F.3d 177, 186 (2d Cir. 2004).  Computer software authored by a programmer in the

16  scope of his employment is a "work made for hire" belonging to the employer.  *See*

17  *Avtec Systems, Inc. v. Pfeiffer*, 21 F.3d 568 (4th Cir. 1994) (computer software held to be

18  work made for hire owned by employer even though programmer wrote it at home during

19  non-work hours).

20

21        1.    Adler Indisputably Wrote and Published The Latter Two Registered
              Works In The Course Of Employment With RelyNet.

22

23    Although Adler has sued for infringement of three different versions of the

24  ZeroForum software, the one at issue is really the last and most recent one, version 2.1.2,

25  Copyright Reg. No. TX -6-210-249, which according to Adler's own copyright registration

26  form was completed and first published on May 27, 2005, while Adler was still an

27  employee of RelyNet.  Davis Decl. ¶ 11 & Ex. J.

28

1    There is no dispute that Adler was an employee of RelyNet, Inc. when he wrote and

2    published both the 2.0.6 Software and the 2.1.2 Software.  Adler was formally employed

3    by RelyNet, Inc. in January 2003, and he remained employed by RelyNet until August 1,

4    2005.  RelyNet paid Adler a salary during this entire time.  DiCarlo Decl. 14.  It was his

5    only significant employment at that time, as he had quit his previous employment in

6    September 2003 and had not taken any other.  AC ¶52; Depo. 179:3-13..  It is undisputed

7    that the 2.0.6 Software was written and published in 2003, after Adler was hired as an

8    employee of RelyNet, and that the 2.1.2 Software was written and published in 2005,

9    before he was terminated as an employee.  Davis Decl. Exs. I, J (copyright registrations);

10   Depo. 96:23-97:15.

11   The chief question, then, is whether Adler created the ZeroForum software "in the

12   scope of" his employment.  *See Gilpin v. Siebert*, 419 F.Supp.2d 1288, 1295 (D. Ore.

13   2006).  The main issue is whether the authorship of the software was "of the kind" of work

14   that the employee was employed to perform.  If it was, then courts will tend to find that the

15   work was authored within the scope of employment despite the fact it was authored during

16   off hours, at home, by the employee.  *See Gilpin v. Siebert*, 419 F.Supp.2d 1288,1295 (D.

17   Ore. 2006) (employee-authored computer software held to belong to employer) (citing

18   *Miller v. CP Chems., Inc.,* 808 F.Supp. 1238, 1242-44 (D.S.C.1992) (computer program

19   prepared at home during off-hours, without direction or extra compensation from employer

20   held work-for-hire), *appeal dismissed,* No. 93-1045 (4th Cir. April 13, 1993); *Marshall v.

21   Miles Lab., Inc.,* 647 F.Supp. 1326, 1330 (N.D. Ind.1986) (same, regarding article written

22   for publication in scientific journal); *In re Simplified Info. Sys., Inc.,* 89 B.R. 538, 542

23   (W.D.Pa.1988) (same, regarding computer software)).

24   There can be no dispute in this case that ZeroForum versions 2.0.6c and 2.1.2 were

25   written by Adler within the scope of his employment with RelyNet.  The only purpose for

26   writing the software was so ZeroForum could use it.  DiCarlo Decl. ¶¶16-17.

27   Adler himself admits that the software was his biggest contribution to the RelyNet

28   business.  AC ¶44.  He never tried to license it to anyone else, or even to develop

1    derivative works for any other purpose.  He authored the software from 2003 to 2005 in

2    part while working on RelyNet computers in RelyNet's offices.  DiCarlo Decl. ¶16; Depo.

3    98:14-102:24.  Adler's primary profession has been as a computer programmer, and

4    writing software is a significant part of what RelyNet hired him to do.  DiCarlo Decl. ¶16.

5    He personally installed each update of the software on RelyNet's computers for use with

6    RelyNet's customers' message boards.  There is no evidence that during the entire time he

7    was employed by RelyNet from January 2003 to August 2005 he ever bargained for or

8    obtained any consideration for his software from *anyone* other than his wages as an

9    employee of RelyNet.  He consented to RelyNet's use of its own name in the copyright

10   notice used to designate the ownership of the software.  DiCarlo Decl. ¶29.

11          On these undisputed facts, regardless of any subjective beliefs or wishes of Adler's,

12   the versions of ZeroForum he authored from 2003 to 2005, including the latter two

13   versions he copyrighted, were prepared within the scope of his employment, and therefore

14   belong to Relynet.  Because he does not own these versions of the software, he cannot

15   claim sue anyone for infringing them.

16          On these facts, there is no dispute that after 2003 all of Adler's authorship of

17   Zeroforum software was in the course and scope of his employment with RelyNet.  Both

18   the 2.0.6 Software and 2.1.2 Software are, therefore, "works made for hire" within the

19   meaning of section 101, and RelyNet, Inc., not Adler, is the author and owner of these two

20   versions of the Software.  Adler cannot state a claim for infringement based upon these

21   versions of the Software because he does not own them.

22

23                 2.      Adler Was An Employee Within The Meaning Of Community for
                           *Creative Non-Violence v. Reid* When He Wrote The First 2.0.5a
24                         Siva Software.

25          Adler indisputably wrote and published the 2.0.5a Siva Software before January

26   2003, when he formally became a salaried employee of RelyNet, Inc.  But the undisputed

27   facts show that he was an employee of RelyNet within the meaning of *Community for*

28

1  *Creative Non-Violence v. Reid*, 490 U.S. 730 (1989), and that his Software was therefore

2  the property of RelyNet, not Adler.

3      In *Community for Creative Non-Violence v Reid*, the Supreme Court held:

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party. *See* Restatement § 220(2) (setting forth a nonexhaustive list of factors relevant to determining whether a hired party is an employee). No one of these factors is determinative.

11  *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-752 (1989) (citing *Ward*

12  *v. Atlantic Coast Line R. Co.,* 362 U.S. 396, 400, 80 S.Ct., at 792 (1960); *Hilton Int'l Co. v.*

13  *NLRB,* 690 F.2d 318, 321 (2d Cir. 1982)) (footnotes omitted).  Absent an express

14  contractual reservation of copyright in an artist engaged as an employee or independent

15  contractor, the presumption arises that the mutual intent of the parties is that title to the

16  copyright shall be in the person at whose instance and expense the work is done. *Lin-*

17  *Brook Builders Hardware v. Gertler*, 352 F.2d 298 (9th Cir. 1965).

18      Although Adler was not a salaried employee of RelyNet before January 2003, he

19  was an employee within the meaning of *Community for Creative Non-Violence v. Reid*.

20  RelyNet was in the business of operating the software that Adler was programming.

21  Adler's programming for RelyNet was not a one-time project but an ongoing, long term

22  engagement.  He admits it was a significant contribution to the RelyNet business.  Depo.

23  124:7-20; 126:7-18.  He programmed the software in part while working at Relynet's

24  offices.  DiCarlo Decl.¶16.  He installed the software on RelyNet computers, for use by

25  RelyNet customers.  DiCarlo Decl. ¶17. To the extent that RelyNet was earning any

26  revenue from the use of the software, in the form of ad revenue generated from the

27  message boards powered by that software, DiCarlo paid Adler a portion of that revenue.

28  DiCarlo Decl. ¶9.  At no point that Adler was involved with RelyNet or its customers

1  would any of those customers have had any reason to believe Adler, as opposed to

2  RelyNet, owned the rights to the software.  The 2.0.5a Siva software, although authored

3  earlier, belongs to RelyNet, not to Adler.

4          3.    Adler Cannot Assert A Claim For Copyright Infringement Of
                  Software That RelyNet Owns or Co-Owns.
5

6          Even if the Court determined that RelyNet was not the owner of the earliest of the

7  three versions, 2.0.5a Siva, Adler would still have no claim, because his claim of

8  infringement of this version is based entirely upon alleged infringement of the later

9  versions, which RelyNet indisputably does own.  At worst, RelyNet is a co-owner of the

10  copyrighted works that allegedly have been infringed.  A co-author of a copyrighted work

11  cannot be liable to another co-author for infringement of the copyright.   Each co-owner of

12  a copyrighted work has an independent right to use or license the usage of the copyright.

13  If a co-author has failed to share profits due a fellow co-author for exploitation of  the

14  work, then an action for an accounting may lie, but there is no liability for infringement.

15  *See Picture Music, Inc. v. Bourne, Inc.*, 314 F. Supp. 640, 646 (S.D.N.Y. 1970)

16  (accounting action).

17
18      B.    Adler Voluntarily Relinquished, For Compensation, All Versions Of The
              Software To RelyNet For Its Use With Its Customers, And Therefore
19            Waived His Right To Sue For Infringement.

20          Even if a dispute of fact exists over whether Adler is the owner and author of one

21  or more of the versions of the Software, there is no dispute that Adler long ago

22  relinquished his rights in the Software to Relynet, and gave permission to RelyNet and to

23  RelyNet's customers to use the Software in exactly the manner he now claims infringes his

24  rights.  His claims are therefore barred.

25          A copyright owner may be barred from suing for infringement if the copyright

26  owner, by his conduct, has relinquished his rights in the work or otherwise consented to the

27  use that he claims is infringing.  There are three related legal doctrines that bar a claim in

28

14

1  these circumstances: waiver, estoppel, and implied license.  Adler's claims are barred by all

2  three doctrines.

3

4        1.    Adler's Infringement Claims Are Barred By The Doctrine Of
              Waiver.

5

6        "Waiver is the intentional relinquishment of a known right with knowledge of its

7  existence and the intent to relinquish it." *United States v. King Features Entm't, Inc.,* 843

8  F.2d 394, 399 (9th Cir.1988).  In copyright, waiver or abandonment of copyright "occurs

9  only if there is an intent by the copyright proprietor to surrender rights in his work." 4

10  Melville B. Nimmer & David Nimmer, *Nimmer On Copyright* ¶ 13.06 (2000); *see also*

11  *Micro Star v. Formgen, Inc.,* 154 F.3d 1107, 1114 (9th Cir.1998) (discussing

12  abandonment).

13        From the beginning, Adler delivered copies of the ZeroForum software to RelyNet,

14  installed the software for use by RelyNet and its customers, and never asked for or

15  received any compensation.  He never reserved his rights in the software, in writing or in

16  any other form.  He consented to RelyNet's use of its name on the copyright notice

17  attached to the software.  DiCarlo Decl. ¶29.  He never attempted to use the software for

18  any purpose apart from RelyNet.  DiCarlo Decl. ¶8; Depo. 91:6-93:2; 95:6-95:12.   By his

19  continuous conduct from the time he first delivered ZeroForum to RelyNet, until after his

20  termination by RelyNet in August 1, 2005, Adler gave up his exclusive rights in the

21  ZeroForum software.

22

23        2.    Adler's Infringement Claims Are Barred By The Doctrine Of
              Estoppel.

24

25        Four elements are necessary to establish estoppel: 1) the party to be estopped must

26  know the facts; 2) he must intend that his conduct shall be acted on or must so act that the

27  party asserting the estoppel has a right to believe it is so intended; 3) the latter must be

28

1    ignorant of the true facts; and 4) he must rely on the former's conduct to his injury. *Bob's*

2    *Big Boy Family Restaurants v. N.L.R.B.,* 625 F.2d 850, 854 (9th Cir.1980).

3         All of the elements of estoppel are present in this case.  First, Adler knew that he

4    was delivering the ZeroForum software to RelyNet for use by RelyNet and its customers,

5    and he knew that he was doing so without promise of compensation and without DiCarlo

6    having either transferred any interest in RelyNet to him or having entered any specific

7    agreement to transfer an interest in RelyNet to Adler.  Second, by his conduct he must

8    have known that RelyNet and its customers would have assumed that RelyNet owned the

9    software, or that it had an unlimited right to use the software.  Third, RelyNet and its

10   customers were ignorant until after August 1, 2005 of any claim by Adler that he owned

11   the software.  Fourth RelyNet and its customers relied upon Adler's conduct to their

12   damage.  Had they known that Adler might claim an exclusive interest in the software they

13   could have, and would have, either stopped using the software or negotiated for a stronger

14   ageement that would allow them to continue using it without interference by Adler.

15        On these facts Adler should be estopped from suing any of the defendants.

16

17        3.    Adler's Infringement Claims Are Barred By The Doctrine Of
               Implied License.
18

19        A party may be found by its conduct to have granted another party an implied

20   license to use its copyrighted work where the party "created a work at [the other's] request

21   and handed it over, intending that [the other] copy and distribute it." *SmithKline Beecham*

22   *Consumer Healthcare, L.P. v. Watson Pharms., Inc.,* 211 F.3d 21, 25 (2d Cir.2000)

23   (quoting *Effects Assocs., Inc. v. Cohen,* 908 F.2d 555, 558 (9th Cir.1990)), *cert. denied,*

24   531 U.S. 872, 121 S.Ct. 173, 148 L.Ed.2d 118 (2000).  An implied license can by implied

25   by a party's conduct. *See Effects Assocs., Inc. v. Cohen,* 908 F.2d 555, 558 (9th Cir. 1990),

26   *cert. denied,* 531 U.S. 872, 121 S. Ct. 173, 148 L. Ed. 2d 118 (2000).  A plaintiff that has,

27   by his conduct, implicitly licensed the right to another to use his copyrighted work is

28   barred from suing for infringement for the other's use. *See Effects Assocs., Inc. v. Cohen,*

1   908 F.2d 555, 558 (9th Cir. 1990) (plaintiff's creating work at defendant's request and

2   handing it over to defendant for copying and distribution amounted to implied license);

3   *Asset Marketing Systems, Inc. v. Gagnon*, 542 F.3d 748, 754 (9th Cir. 2008) (summary

4   judgment upheld against contractor's claim for infringement; his conduct amounted to

5   grant of nonexclusive, unlimited license to use and create derivative works of his

6   software); *Oddo v. Ries*, 743 F.2d 630, 632-634 (9th Cir. 1984) (author's implicitly licensed

7   partner to publish book that was derivative of his work by handing over manuscript for

8   publication).

9          The elements of an unlimited implied license are all present here.  Adler delivered

10  the ZeroForum for its use and the use of its customers.  Depo. 59:16-60:22; 86:15-87:20;

11  88:4-89:12; 93:3-95:5.   As a sophisticated programmer he knew or must have known that

12  the use by RelyNet's customers of the message boards would result in the "copying" he

13  alleges as infringement in this case.  He knew that RelyNet would earn money in the form

14  of ad revenue from the message boards it hosted.  On these facts Adler must be deemed to

15  have granted an implied license to RelyNet (and its customers) to continue using the

16  software.  He cannot now, years after the fact, complain about what he allowed RelyNet

17  and its customers to do as far back as 2002.

18

19          C.      Adler's Claims For Copyright Infringement Against Defendants VW Vortex
                    and Intermedia Are Not Based Upon Actionable Infringing Conduct.
20

21          To prove a claim of infringement, a plaintiff must prove that the defendant has

22  engaged in a volitional act.  Computer or internet related activity that results in the mere

23  incidental copying of copyrightable matter does not necessarily prove copyright

24  infringement. *See Religious Technology Center v. Netcom Online Communication Center*,

25  907 F. Supp. 1361, 1369-70 (N.D. Cal. 1995) (internet access provider was not liable for

26  direct infringement merely because copies of web page content were saved on its

27  computer); *see Costar Group, Inc. v. Loopnet, Inc.*, 373 F.3d 544, 550-551, 555 (4th Cir.

28

1    2004) (internet service provider not liable for the passive storage of copyrighted material

2    that occurs at the direction of its users).

3         Adler's infringement claims against defendants VW Vortex and Intermedia are not

4    based upon any evidence that these RelyNet customers have copied, published, displayed,

5    or distributed his alleged software in the ordinary sense.  The evidence is undisputed that

6    in the course of its dealings with these customers since at least August 1, 2005 RelyNet has

7    not actually delivered any copies of the software in any form to them.  DiCarlo Decl. ¶¶35,

8    36.  The only allegation of infringement against these two defendants is that the viewing of

9    and interaction with the message boards by these customers' users results automatically,

10   via the user's Internet web browser software, in the saving of the html underlying the

11   message board web pages in the user's computer's random access memory and cache.

12   Depo. 115:5-117:10; 132:11-147:5.  Neither of these processes is integral to the user of the

13   message boards by VW Vortex or Intermedia Outdoors.  DiCarlo Decl.¶37; Davis Decl.,

14   Ex. E (Adler Interrogatory Reponses, Nos. 20, 21, 22, 24) .  They are not "volitional" in

15   any way, and cannot support a claim.

16

17   V.    ADLER'S CLAIM FOR FRAUD MUST FAIL

18         The gist of Adler's fraud claim is that DiCarlo "made continuing promises and

19   representations that Plaintiff was a 50% owner of RelyNet, both while it operated as a

20   partnership and after it commenced operating as a corporation in October 2002."  AC

21   20:19-21; Depo. 42:15-46:4.  The nature of the claim is not entirely clear.  It is either a

22   claim for false misrepresentation of an alleged fact, *i.e.*, DiCarlo's falsely represented to

23   Adler that Adler was a 50% owner of the RelyNet business when in fact he was not; or it is

24   a claim for false promise, *i.e.*, DiCarlo falsely promised that he would make Adler a co-

25   owner of the business, when in fact he did not and never intended to.  In either case, Adler

26   must prove certain elements to sustain a claim for fraud: (1) that DiCarlo made a false

27   promise or statement of fact to Adler; (2) that he knew it was false at the time he made it;

28   (3) that he intended to induce Adler's reliance upon the fraud; (4) that Adler did in fact rely

1   upon the false statement or false promise, and that his reliance was justifiable and

2   reasonable; and (5) that he suffered damage as a result of his reliance upon the fraud.  *In re*

3   *Napster, Inc. Copyright Litigation*, 479 F.3d 1078, 1096 (9th Cir. 2007) (quoting *Small v.*

4   *Fritz Cos., Inc.,* 30 Cal.4th 167, 132 Cal.Rptr.2d 490, 65 P.3d 1255, 1258 (2003)); *see*

5   *Andrews Farms v. Calcot, Ltd.*, 527 F. Supp. 2d 1239, 1250 (E.D. Cal. 2007) (citing *Lazar*

6   *v. Superior Court*, 12 Cal. 4th 631, 638 (1996) (elements of fraud claim)); (intentional

7   misrepresentation elements); *see also* Cal. Civ. Code §1709, 1710 (deceit and actionable

8   fraud).

9

10      A.      Adler's Claim For Fraud Is Barred By The Three-Year Statute Of
                Limitations

11

12      The statute of limitations for a claim for fraud is three years.  Cal. Civ. Proc. Code

13   §338.  A plaintiff cannot sue for fraud if the plaintiff knew or should have known the facts

14   giving rise to the fraud claim more than three years before filing suit.  *See Terranova v.*

15   *Terranova*, 883 F. Supp. 1273, 1281 (W.D. Wis. 1995) (misrepresentation claim barred

16   where plaintiff learned facts more than three years before filing); *Krieger v. Nick*

17   *Alexander Imports, Inc.,* 234 Cal.App.3d 205, 219 (1991).

18      Here, there is no dispute that Adler had actual knowledge of all the facts to support

19   his allegations for fraud more than three years before the date that he filed his lawsuit --

20   June 12, 2008.  Adler's complaint alleges that DiCarlo "continuously" lied to him for years.

21   AC¶82; Depo. 170:3-171:16.  In his complaint and at deposition Adler admitted he

22   discovered DiCarlo's "deception" as early as 2003, when he found out that RelyNet was

23   paying DiCarlo more than it was paying Adler, despite DiCarlo's alleged promise to Adler

24   that both of them would be paid equally.  Adler claims he found out about this "deception"

25   again in 2004, and once again in early 2005.  AC¶51; DiCarlo Decl. ¶15; Depo. 71:15-

26   74:23; 147:6-153:13; 161:13-163:22.  In the June 15, 2005 letter agreement --which by his

27   own admission is not based upon any newly discovered facts on or immediately prior to

28   the date he wrote it -- he accused DiCarlo of having lied to him, more than once.  DiCarlo

1   Decl., Ex. H.  At deposition Adler admitted that his letter was not based upon any new

2   *facts* -- he was aware much more than three years before he filed his complaint of all the

3   facts to establish his belief that DiCarlo was lying to him about making him a shareholder

4   in RelyNet, Inc., and that DiCarlo never intended to do so.  His claim is barred by the

5   undisputed facts.

6        Adler no doubt will claim that DiCarlo's execution of the 2005 letter agreement on

7   June 20, 2005 restarted the limitations clock.  That claim defies reason.  Having been

8   convinced of DiCarlo's deception prior to June 2005, Adler cannot now claim reasonably

9   that he was reassured by DiCarlo's execution of the agreement on June 20, 2005.  Adler

10   himself admits that he "hoped" that DiCarlo would abide by the June 20, 2005 agreement,

11   not that he "believed" he would.  Depo. 178:4-179:2.  His contemporaneous emails in 2005

12   show he remained skeptical of DiCarlo's motives *based upon prior conduct of which he*

13   *already was aware*.  Davis Decl.¶8 & Ex. G (pp. 3759).  Only three days after DiCarlo

14   signed the letter agreement, Adler wrote to his mother: "He signed the paper, so he bought

15   himself 6 months.  We'll see."  Davis Decl.¶8 & Ex. G (pp. 3647, 3670, 3671-72, 3726,

16   3736, 3746-48, 3759).  Most tellingly, at about the same time DiCarlo was signing the

17   paper Adler was sabotaging RelyNet's data, so if he left the company he could ensure that

18   it could not use "his" software.  Depo. 162:5-163:23; 175:21-177:4.  Obviously, DiCarlo's

19   execution of the letter agreement did not suddenly reassure Adler that DiCarlo was going

20   to pay him after allegedly lying to him for so long.  On these undisputed facts, Adler's

21   fraud claim, if he ever had one, accrued well before June 2005, and thus is time-barred.

22

23       **B.**     **The 2005 Letter Agreement, On Its Face, Cannot Support A Claim For**

24               **Fraud**

25        The only fraudulent "act" that Adler alleges within the three-year limitations period

26   is DiCarlo's execution of the June letter agreement, which Adler delivered to DiCarlo on

27   June 15, 2005 (the lawsuit was filed June 12, 2008).  But it is evident from the face of the

28

1    agreement and the parties' contemporaneous conduct and statements that the "promise"

2    contained in this agreement was not what Adler alleges it is.

3         On its face, the "promise" contained in the 2005 letter agreement was not an

4    unconditional promise to deliver to Adler 49% of the RelyNet stock. Rather, it was a

5    memorandum acknowledging an understanding between the parties: If DiCarlo did not

6    deliver 49% of the stock to Adler by January 1, 2006, Adler would quit the employment of

7    RelyNet. That Adler understood the agreement this way is clear not only from the

8    language of the agreement on its face, *see* DiCarlo Decl.¶30, Ex. H, but also from roughly

9    contemporaneous emails written by and to Adler, Davis Decl.¶8 & Ex. G (pp. 3647, 3670,

10   3671-72, 3726, 3736, 3746-48, 3759), and from Adler's own testimony. Depo. 172:9-

11   173:6.

12        Since Adler was never promised anything, he cannot support a claim for

13   promissory fraud.

14

15        C.       The 2005 Letter Agreement Waived His Fraud Claim.

16

17        When a party, complaining of another's fraud, enters a contract with that other party

18   to resolve the matter relating to the alleged fraud, that party waives its right to allege fraud.

19   *See Oakland Raiders v. Oakland-Alameda County Coliseum, Inc.*, 144 Cal. App. 4th 1175,

20   1186, 51 Cal. Rptr. 3d 144, 151 (2006); *see Schmidt v. Mesmer*, 116 Cal. 267, 270-271

21   (1897) (plaintiff waives fraud claim where plaintiff affirms contract that supersedes alleged

22   fraud); *Bagdasarian v. Gragdon*, 31 Cal. 2d 744, 751-752 (1948) (modifying *Schmidt* rule;

23   fraud claim may be waived by agreement of parties or estoppel).

24        As did the plaintiff in the Oakland Raiders case, Adler alleges that DiCarlo lied to

25   him, and that he and DiCarlo subsequently entered a contract to resolve the subject matter

26   of the lies. DiCarlo Decl.¶30, Ex. H (reference to "lies" and "promises"). DiCarlo signed

27   the letter on June 21, 2005 and gave it back to Adler. DiCarlo Decl. ¶30. In his

28   companion lawsuit, Adler specifically seeks to affirm and enforce the terms of this

     contract, asking the state court to grant him specific performance and declaratory relief in

1    the form of delivering shares of stock to him.  Davis Decl. ¶4, Ex. C, pp. 7-8.  By affirming

2    the letter agreement and seeking performance of it Adler has waived any right to bring a

3    separate, and conflicting, claim of fraud based upon the same subject matter as the letter

4    agreement.

5

6        D.    The Undisputed Facts Show That Adler Did Not Detrimentally Rely Upon
               DiCarlo's Alleged "Promise."
7

8        An essential element to any fraud claim is detrimental reliance.  The plaintiff must

9    plead and prove not only that the defendant made a false statement or false promise, but

10   that the plaintiff reasonably and justifiably relied upon that statement to his detriment.

11   *Soliman v. Philip Morris Inc.*, 311 F.3d 966, 975 (9th Cir. 2002), *reh. denied, cert denied*,

12   540 U.S. 814, 124 S. Ct. 64, 157 L. Ed. 2d 28 (2002) (claim of fraud by smoker barred;

13   smoker was presumed to know that alleged misrepresentations about smoking safety were

14   false); *see Conrad v. Bank of America*, 45 Cal. App. 4th 133, 157 (1996) (alleged evidence

15   of reliance insufficient where plaintiff did not change its position and could not claim on

16   facts  it believed promise to make loan).  Even if one assumes, for the sake of argument,

17   that the 2005 letter agreement constituted an otherwise actionable false promise or

18   statement, the undisputed facts demonstrate here that Adler did not actually rely upon that

19   promise, and that any reliance would have been wholly unreasonable.

20

21        1.    Adler In Fact Did Not Believe DiCarlo Would Keep His "Promise."

22

23        To prove that he relied upon DiCarlo's June 2005 "promise", Adler must prove that

24   he actually believed the promise.  Yet, he obviously did not.  The letter itself voices Adler's

     criticism and skepticism toward DiCarlo's alleged motives and truthfulness.  DiCarlo Decl.
25
     ¶30, Ex. H.  Adler's contemporaneous email communications show that he cautiously was
26
     hoping that DiCarlo would give him the stock he thought he was due, not that he actually
27
     believed he would.  Davis Decl.¶8 & Ex. G (pp. 3647, 3670, 3671-72, 3726, 3736, 3746-
28
     48, 3759).  And in deposition he admitted he "had high hopes" that DiCarlo would come

1    through, not that he really believed he would.  Depo. 177:22-179:2.  His deletion of backup

2    data from RelyNet's servers demonstrates that he did not really believe DiCarlo ever would

3    pay him, and he wanted to be in a position to leave the company and deprive it of the use

4    of "his" software when he left.  Depo. 182:10-192:10.

5          Obviously, Adler did not actually believe that DiCarlo ever would give him 49% of

6    RelyNet's stock.  He cannot claim he ever relied upon any promise by DiCarlo, and

7    therefore he cannot state a claim.

8

9                 2.      By His Own Admissions, Adler's Reliance Could Not Have Been

10                         Reasonable.

11          To sustain a claim for fraud, a plaintiff must not only prove that he relied upon the

12    alleged false statement or promise, but that his reliance was justifiable and reasonable.  The

13    "reasonableness" of a plaintiff's reliance is usually a question of fact for the jury.  But

14    "whether a party's reliance was justified may be decided as a matter of law if reasonable

15    minds can come to *only one* conclusion based on the facts."  *City Solutions, Inc. v. Clear*

16    *Channel Communications*, 365 F.3d 835, 840 (9th Cir. 2004) (citing *Guido v. Koopman,* 1

17    Cal.App.4th 837, 843, 2 Cal.Rptr.2d 437 (1991)).  In *Guido v. Koopman*, an attorney sued

18    defendant for injuries resulting from being thrown from defendant's horse.  The attorneys

19    sought to rescind a written release on grounds of fraud.  The court held that the attorney's

20    alleged reliance on the fraud was not reasonable as a matter of law, given the attorney's use

21    of releases in her practice.  The court affirmed summary judgment against the injured

22    attorney's claims.  *Id.*

23          Even if Adler were able to prove, beyond all reason, that he was gullible enough

24    actually to believe that DiCarlo was going to give him 49% of RelyNet, Inc., the

25    undisputed facts demonstrate his belief was unreasonable.  As of June 15, 2005, when

26    Adler presented his letter agreement to DiCarlo, he knew, by his own admission, that

27    DiCarlo had failed to deliver to Adler any stock, or for that matter any proof of ownership

28    of any kind in RelyNet as a corporation, partnership, or business venture.  Depo. 67:17-

1   74:24. In his draft letter to DiCarlo, he wrote "You never change, Mike." In his

2   contemporaneous email correspondence with Layton Wedgeworth, Layton revealed to him

3   that DiCarlo did not believe he was really obligated to give Adler the stock. Davis Decl.

4   ¶8, Ex. G (pp. 3736, 3746-47). It was obviously unreasonable and unjustifiable as a matter

5   of law for Adler to believe, based upon everything he admits he knew at that point, that

6   DiCarlo would pay him the shares of stock.

7

8            3.       Adler In Fact Did Not Rely Upon The Letter Agreement To His
                      Detriment Or Injury.

9

10          Adler has no claim for false promise unless he can show not only that he believed

11   DiCarlo's promise but that he relied upon it, and did so to his detriment. If he cannot show

12   both reliance and detriment resulting from that reliance, his claim must fail. *See Service by*

13   *Medallion, Inc. v. Clorox Co*., 44 Cal. App. 4th 1807, 1818 (1996) (claim against employer

14   for false representations failed because employee could not demonstrate link between

15   alleged acts in reliance – entering contract and preparing to perform – and injury –

16   termination of employment). *See* Cal. Civ. Code §3333 (necessity of proximate

17   causation). As the court in *Service by Medallion* explained:

18            "In order to recover for fraud, as in any other tort, the plaintiff must plead
             and prove the "detriment proximately caused" by the defendant's tortious conduct.
19            (Civ. Code, § 3333.) Deception without resulting loss is not actionable fraud. ( *Hill
             v. Wrather* (1958) 158 Cal.App.2d 818, 825 [323 P.2d 567].) "Whatever form it
20            takes, the injury or damage must not only be distinctly alleged but its causal
             connection with the reliance on the representations must be shown." 5 Witkin, Cal.
21            Procedure (3d ed. 1985) Pleading, § 680, p. 131. Viewed in terms of materiality,
             "[a] false representation which cannot possibly affect the intrinsic merits of a
22            business transaction must necessarily be immaterial because reliance upon it could
             not produce injury in a legal sense." *Hill v. Wrather, supra*, 158 Cal.App.2d at p.
             824.)
23

24   44 Cal. App. 4th 1807, 1818 (1996) (affirming judgment against plaintiff).

25          The undisputed facts conclusively prove that Adler in fact did not rely upon

26   DiCarlo's promise and did not suffer any detriment as a result of it. First, he did not really

27   believe it, or at best was skeptical of whether DiCarlo would do what Adler wanted him to.

28   Depo. 178:4-179:2; Davis Decl.¶8 & Ex. G (pp. 3647, 3670, 3671-72, 3726, 3736, 3746-

48, 3759). Second, Adler did not in any way change his position because of the "promise."

1  DiCarlo Decl.¶31; Depo. 179:3-180:11.  Without some sort of material, detrimental change

2  in his position *that resulted from DiCarlo's "promise" in the June 2005 letter*, Adler cannot

3  claim that DiCarlo defrauded him in any way.  Since the undisputed evidence disproves

4  Adler's claim of detrimental reliance, his fraud claim must fail.

5

6

7                                    **CONCLUSION**

8          The undisputed facts demonstrate that Adler cannot prevail on either of his claims

9  against defendants DiCarlo or RelyNet (or, by extension, defendants Intermedia Outdoors,

   VW Vortex, or Internet Brands, either).  Defendants respectfully request that the court

10 grant summary judgment, or, in the alternative, summary adjudication against one or more

11 of Adler's claims.

12

13

   DATED: October 7, 2009                          DAVIS & LEONARD LLP

14

15

16

                                                   Stephen L. Davis
17                                                 DAVIS & LEONARD, LLP
                                                   Attorneys for RelyNet, Inc. and
18                                                 Michael DiCarlo

19

20

21

22

23

24

25

26

27

28