John P. Costello, Esq. (California State Bar No. 161511)
Pamela W. Bertani, Esq. (California State Bar No. 182672)
**COSTELLO LAW CORPORATION**
331 J Street, Suite 200
Sacramento, California 95814
Telephone No.: (916) 441-2234
Fax No: (916) 441-4254

Glenn W. Peterson, Esq. (California State Bar No. 126173)
**MILLSTONE PETERSON & WATTS, LLP**
2267 Lava Ridge Court, Suite 210
Roseville, CA 95661
Telephone: (916) 780-8222
Fax No: (916) 780-8775

Attorneys for Plaintiff/Counterdefendant
Dustin K. Adler

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DUSTIN K. ADLER, an individual,<br><br>        Plaintiff,<br><br>   vs.<br><br>RELYNET, INC., a California Corporation, MICHAEL DICARLO, an individual, INTERNET BRAND, INC., a Delaware corporation, INTERMEDIA OUTDOORS, INC., a Delaware corporation, VORTEX MEDIA GROUP, INC., a Delaware corporation, and DOES 1 through 50, inclusively,<br><br>        Defendants.<br><br>RELYNET, INC., a California Corporation, MICHAEL DICARLO, an individual, and DOES 1 through 50, inclusively,<br><br>        Counterclaimants,<br><br>   vs.<br><br>DUSTIN K. ADLER, an individual,<br><br>        Counterdefendant. | Case No. 2:08-CV-01333-JAM-EFB<br><br>**TRIAL BRIEF**<br><br>Trial Date:   January 25, 2010<br>Courtroom:  6<br><br>Hon. John A. Mendez |

MILLSTONE
PETERSON&
WATTS, LLP

1

# TABLE OF CONTENTS

Page No.

I.    INTRODUCTION ...................................................................................................1

II.   BRIEF STATEMENT OF FACTS........................................................................1

III.  POINTS OF LAW ................................................................................................2

    A.    PLAINTIFF DUSTIN ADLER HAS ESTABLISHED A PRIMA FACIE
        CASE OF COPYRIGHT INFRINGEMENT ..................................................... 2

    B.    DEFENDANTS' COMMERCIALLY SOLD UNAUTHORIZED
        DERIVATIVE WORKS CONTAINING PLAINTIFF'S ZEROFORUM
        BASE CODE, WHICH CONSTITUTES CLASSIC COPYRIGHT
        INFRINGEMENT................................................................................................ 4

        1.    General Principles Of Derivative Works .................................................. 4

        2.    General Principles Of Works Made For Hire ................................................. 6

        3.    Creating A Derivative Work As A "Work Made For Hire" Does Not
            Entitle The Employer To Ownership Of The Pre-Existing Work ................... 7

        4.    Defendants Commercially Sold Unauthorized Derivative Works
            Containing Adler's ZeroForum Base Code, Which Constitutes Classic
            Copyright Infringement ........................................................................ 12

            a.    The ZeroForum Software Defendants Ultimately Sold To
                Internet Brands Is An Unauthorized Derivative Work Of
                Plaintiff's ZeroForum Software – And Constitutes Classic
                Copyright Infringement ...................................................... 13

            b.    The LiveTopic Software That Defendants Advertise And
                License To Consumers Is An Unauthorized Derivative Work
                Of Plaintiff's ZeroForum Software – And Constitutes Classic
                Infringement ............................................................................. 14

    C.    ADLER DID NOT CREATE ZEROFORUM AS A WORK MADE FOR
        HIRE OWNED BY RELYNET – ADLER CREATED THE BASE CODE
        ON HIS HOME EQUIPMENT WHILE WORKING AS AN INDEPENDENT
        CONTRACTOR FOR GDT-NOVA........................................................... 14

        1.    Adler Was Not A RelyNet Employee Within The Meaning Of
            *Creative Non-Violence v. Reid*........................................................... 15

        2.    Adler Created ZeroForum 2.0 And ZeroForum 2.0.5a Siva  – The
            Platform Of All Subsequent ZeroForum Updates – From Home, Using
            His Own Equipment And While Unemployed ........................................ 16

         3.    Adler Completed ZeroForum 2.0.6c and ZeroForum 2.1.2  – Both Of
            Which Are Derivative Works Of ZeroForum 2.0.5a Siva – Without
            Any Supervision Or Substantive Input By DiCarlo Or RelyNet ................... 17



MILLSTONE
PETERSON&
WATTS, LLP

TRIAL BRIEF

1

**TABLE OF CONTENTS**
(continued)

2

Page No.

3      D.    PLAINTIFF DID NOT RELINQUISH HIS COPYRIGHT OWNERSHIP IN
             THE ZEROFORUM SOFTWARE – DEFENDANTS' HODGEPODGE OF
4            "RELINQUISHMENT" THEORIES IS BELIED BY UNDISPUTED FACTS........ 18

5            1.    Waiver.................................................................................................. 18

6            2.    Adler Has Not Granted Defendants An Implied License In Perpetuity
                   To Use ZeroForum – And Any Perceived License Was Expressly
7                  Revoked In 2005 ................................................................................ 19

8            3.    Defendants' Estoppel Argument Is Indefensible............................................ 20

9      E.    DEFENDANTS CANNOT SATISIFY THE SPECIFIC INTENT
             REQUIREMENT OF PENAL CODE SECTION 502 – WHICH OBIVIATES
10           DEFENDANTS' CORRESPONDING CLAIM ............................................... 21

11     F.    ADLER IS ENTITLED TO DAMAGES FOR DEFENDANTS'
             INFRINGEMENT OF ADLER'S ZEROFORUM COPYRIGHTS ............................ 22

12
             1.    Adler Is Entitled To Actual Damages............................................................ 22
13
                   a.    Plaintiff Is Entitled To Profits Defendants Generated By
14                       Selling The Honda-Tech.com Website And ZeroForum To
                         Internet Brands In February 2007 For $2.7 Million ......................... 22
15
                   b.    Plaintiff Is Entitled To Damages and the Profits Defendants
16                       Generated By Selling ZeroForum Licenses To Multiple
                         RelyNet Customers ......................................................................... 23
17
IV.    CONCLUSION....................................................................................................24

18

19

20

21

22

23

24

25

26

27

28

TRIAL BRIEF

## I. INTRODUCTION

The First Amended Complaint that commenced this litigation contains two counts: (1) Copyright Infringement; and (2) Fraud. Only Count One is on trial.[1]

At issue is ownership of a valuable software platform (derived from Plaintiff's copyrighted source code) called ZeroForum. Plaintiff Dustin Adler is the author of ZeroForum – and undisputed owner of three corresponding federal copyright registrations. Adler has neither assigned nor otherwise transferred his ownership in the ZeroForum copyrights. As demonstrated below, Adler's evidence compels a finding of liability against Defendants Michael DiCarlo and RelyNet, Inc. on Count One for Copyright Infringement of the ZeroForum software – and supports a substantial award of damages and attorney's fees. Defendants' primary defense in this case--that Defendants somehow vicariously own or impliedly license the ZeroForum software-- fails as a matter of law. It is also insincere, since indisputable evidence shows conduct on RelyNet's part that is wholly inconsistent with the vicarious ownership/license it now asserts. Accordingly, we expect to prove that Defendants' infringement of the ZeroForum Software was willful or in reckless disregard of Plaintiff's exclusive authorship rights and copyrights. Moreover, Defendants' assortment of theories for establishing ZeroForum ownership all succumb to one pivotal fact –Adler authored and optimized 95% of the ZeroForum Software source code back in 2002 from home, on his personal electronic equipment, while working as an independent contractor for a company called GDT-Nova and under no employment affiliation with RelyNet or DiCarlo. Under settled Ninth Circuit law, there is simply no legal basis for Defendants' claim of vicarious ownership in the ZeroForum source code, or any portion or version thereof. Defendants' conduct warrants a substantial award of damages to Plaintiff for willful copyright infringement.

## II. BRIEF STATEMENT OF FACTS

This is a copyright infringement action by Plaintiff Dustin K. Adler, who is the registered owner of three software copyrights in a software platform called ZeroForum. Plaintiff claims that

---

[1] The Court granted Defendant's motion for summary judgment on Plaintiff's Fraud Claim. Plaintiff has filed a Motion for Reconsideration, which is scheduled to be heard post-trial, on March 3, 2010.

MILLSTONE PETERSON & WATTS, LLP

1    Defendants have infringed his  copyrights by using the software for commercial gain after Plaintiff's

2    permission was terminated.

3            ZeroForum culminated from a nucleus of events set in motion almost ten years ago.  Back in

4    2000, Plaintiff discovered that a Honda Internet bulletin board, then known as Honda-Acura.net, was

5    in the process of losing its website hosting capabilities.  Plaintiff, being the programming expert and

6    automotive aficionado that he is, viewed this hosting dilemma as a golden opportunity to augment

7    the then existing Honda-Acura online message board community – and continue to hone his

8    programming skills in the process.  Thus, from the inception of ZeroForum creation, Plaintiff always

9    envisioned his software being utilized as an Internet discussion engine to facilitate (i.e., host) online

10   automotive discussions efficiently and in an electronically reliable medium.  Plaintiff set out to

11   facilitate hosting the Honda-Acura.net website and running the forum on his then favorite topic –

12   Honda vehicles.  It was Plaintiff's idea to ultimately join forces with Defendants to use ZeroForum

13   Platform to host what ultimately became the website www.Honda-Tech.com.

14           Plaintiff alleges that Defendants Michal DiCarlo ("DiCarlo") and RelyNet, Inc. ("RelyNet")

15   infringed his copyrights in three copyrighted works, ZeroForum Version 2.0.5a Siva (TX 6-210-247.

16   Correspondingly, Plaintiff claims that he is entitled to recover the profits Defendants realized from

17   the unauthorized use of his ZeroForum software, which includes Defendants' sale of the

18   www.Honda-Tech.com website "Powered By ZeroForum" for $2.7 Million.

19                                      **III.  POINTS OF LAW**

20   **A.      PLAINTIFF DUSTIN ADLER HAS ESTABLISHED A PRIMA FACIE CASE OF**

21   **         COPYRIGHT INFRINGEMENT**

22           Anyone who violates the exclusive rights of a copyright owner is an infringer of the

23   copyright.  17 U.S.C. §501(a).  These rights fall into the five categories of reproduction, derivative

24   work creation, distribution, performance and display.  17 U.S.C. §106.  If a valid copyright exists,

25   the elements to be proved in a copyright infringement action are: (1) Plaintiff's ownership of the

26   copyright, *Pasillas v. McDonald's Corp.*, 927 F.2d 440 (9th Cir. 1991); and Defendant's

27   unauthorized copying of protected expression in the copyrighted work sufficient to amount to

28   unlawful appropriation.  *Narrell v. Freeman*, 872 F.2d 907, 910 (9th Cir. 1989).  See *Feist*

1   *Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 361 (1991).  The standard of proof

2   for issues in copyright infringement cases is a preponderance of the evidence.  *Herwitz v. National*

3   *Broadcasting Co.*, 210 F.Supp. 231 (S.D.N.Y. 1962).

4       Plaintiff, as author of the three works at issue, is the owner of the copyrights.  17 U.S.C.

5   §201(a) ("copyright in a work … vests initially in the author or authors of the work.")   The

6   Copyright Office has issued certificates of registration for each of these works identifying Adler as

7   the author and owner of the respective copyrights.  Pursuant to §410(c) of the Copyright Act, these

8   certificates of registration, which were made within five years after first publication of the works,

9   constitute prima facie evidence of the validity of the copyrights and of all facts stated in the

10  copyright certificates.  *Cooling Sys. & Flexibles v. Stuart Radiator, Inc.*, 777 F.2d 485, 490 (9th Cir.

11  1985).  Introducing the copyright registration certificates creates a rebuttable presumption, shifting

12  the burden of proof to Defendants on all points of copyright validity and ownership contained in the

13  certificates.  See *Bell v. Combined Registry Co.*, 397 F.Supp. 1241 (N.D. Ill. 1975).

14      As to the second element of infringement, "copying", there is no serious dispute.  Defendants

15  have admittedly copied all three of Plaintiff's copyrighted works in their entirety, combined them

16  with other works, and distributed them to numerous organizations and individuals.  In February

17  2007, Defendants sold Plaintiff's the web site developed by Adler and the copyrighted ZeroForum

18  Software to a company called Internet Brands, Inc. for $2.7 million – without paying Plaintiff one

19  cent as consideration for that sale.  Defendants have therefore violated at least three of the exclusive

20  rights that Copyright Act §106 provides to copyright owners, namely: the exclusive right to

21  reproduce the copyrighted works (§106(1)); the exclusive right to prepare derivative works (by

22  combining them in compilation with other works) (§106(2)); and the exclusive right to distribute

23  copies of the works to the public (§106(3)).

24      The United States Supreme Court has often recognized that one of the important functions of

25  copyright law is to incentivize the creation of new works by providing economic benefits to authors.

26  "The rights conferred by copyright are designed to assure contributors to the store of knowledge a

27  fair return for their labors."  *Harper & Row Publishers v. Nation Enterprises*, 105 S.Ct. 2218, 2223

28  (1985).  By establishing a marketable right to the use of one's expression, copyright supplies the

1  economic incentive to create and disseminate ideas. *Id.* In *Mazer v. Stein*, the Court stated that

2  "[t]he economic philosophy behind the [copyright] clause is the conviction that encouragement of

3  individual effort by personal gain is the best way to advance public welfare through the talents of

4  authors …." Congress implemented these constitutional mandates by providing to copyright owners

5  the exclusive rights set forth in §106. This bundle of exclusive rights, together with the remedies

6  provided in the Copyright Act, reflect the importance of an author's right to control the manner in

7  which his works are exploited by others.

8  **B.    DEFENDANTS' COMMERCIALLY SOLD UNAUTHORIZED DERIVATIVE**
   **WORKS CONTAINING PLAINTIFF'S ZEROFORUM BASE CODE, WHICH**
9  **CONSTITUTES CLASSIC COPYRIGHT INFRINGEMENT**

10      The analytical focal point of this case, which the parties apparently agree upon, is the

11  derivative work doctrine. The ZeroForum software at issue – the software that Defendants

12  ultimately sold to Internet Brands for $2.7 million dollars – is a derivative work authored by Plaintiff

13  Dustin Adler. That much is undisputed. However, because Adler authored some of the derivatives

14  while employed by RelyNet, RelyNet claims that it owns both the derivative and the preexisting

15  portions incorporated therein. We shall demonstrate the folly of this claim with reference to

16  undisputed facts and well-settled law. When Adler joined RelyNet as an employee in 2003, he had

17  already written and deployed 95% of the source code that would ultimately be sold to Internet

18  Brands for $2.7 million dollars.

19      Thus, evaluating ZeroForum's status as a derivative work is of paramount importance

20  because ownership of a derivative work turns on who owns the underlying/preexisting work, from

21  which the "derivative work" was created.

22      **1.    General Principles Of Derivative Works**

23      Derivative works are based on preexisting – underlying – works, which retain individual

24  copyright status separate and apart from the derivative work. Section 101 of the Copyright Act

25  defines a "derivative work" as follows:

26      A work based upon one or more *pre-existing w*orks, such as a translation, fictionalization,
27      motion picture version, sound recording, art reproduction, abridgement, condensation, or any
       other form in which a work may be recast, transformed or adapted. A work consisting of
28      editorial revisions, annotations, elaborations, or other modifications which, as a whole,

represent an original work of authorship, is a 'derivative work.' (Emphasis added.) 17 U.S.C. §101, Copyright Act of 1976 (hereinafter "1976 Copyright Act" or "Copyright Act.)

In the Ninth Circuit, a derivative work under the Copyright Act is one that would be considered an infringing work if the incorporated preexisting material were taken without the owner's consent. *Babak Sobhani v. @Radical.Media, Inc.*, 257 F.Supp.2d 1234, 1238 (C.D. Cal. 2003) (citing *Mirage Editions, Inc. v. Albuquerque A.R.T. Co.*, 856 F.2d 1341 (9th Cir. 1988).) Accordingly, if a work is derived from a preexisting work, and the new work thereby infringes a copyright in the preexisting work, then the new work is an unauthorized (and infringing) derivative work. *Babak Sobhani v. @Radical.Media, Inc.*, supra, 257 F.Supp.2d at 1238 (citing *Anderson v. Stallone*, 1989 U.S. Dist. LEXIS 11109 at 25 (C.D. Cal. 1989), *Litchfield v. Spielberg*, 736 F.2d 1352 (9th Cir. 1984).)

The legal interplay between *pre-existing works* and *derivative works* is important in this case. By definition, a *derivative work* is based upon a *pre-existing (i.e., underlying)* work. The pre-existing work serves as a foundation upon which information is added to create a derivative work. By law, the owner of a pre-existing work continues to own the copyrights in the pre-existing work, even if that pre-existing work is subsequently incorporated into a derivative work. *1 Nimmer On Copyright*, §3.06 at 3-34.30. Indeed, the owner of a copyrighted pre-existing work exclusively owns *the right to prepare derivative works* incorporating the pre-existing work.[2] Thus, if the pre-existing work that serves as the foundation for a derivative work is itself protected by copyright, then its unauthorized incorporation into a derivative work constitutes copyright infringement. See 1 *Nimmer on Copyright* §3.06 at 3-34.30 n. 4 (citing *Szekely v. Eagle Lion Films, Inc.*, 140 F.Supp. 843(S.D.N.Y. 1956); *Cortner v. Israel*, 732 F.2d 267 (2nd Cir. 1984).) In other words, a derivative work incorporating a copyrighted pre-existing work, without the pre-existing work owner's consent, constitutes copyright infringement of the pre-existing work. See 1 *Nimmer on Copyright* §3.06 at 3-

---

[2] A federally registered copyright entitles the owner to a *bundle* of six cognizable copyrights, comprising the rights to do and to authorize any of the following: (1) reproduce the copyrighted work; (2) *prepare derivative works* based upon the copyrighted work; (3) distribute copies of the copyrighted work; (4) publicly perform the copyrighted work; (5) publicly display the copyrighted work; and (6) publicly perform the copyrighted work. Copyright Act §106.

1  34.30 n. 6.1 (citing *Matell, Inc. v. Robarb's Inc.*, 139 F.Supp.2d 487, 497 (S.D.N.Y. 2001); *Bucklew*

2  *v. Hawkins, Ash, Baptie & Co.*, 329 F.3d 923, 030 (7th Cir. 2003).)

3      **2.      General Principles Of Works Made For Hire**

4      Defendants claim ownership of the ZeroForum Software via the Work Made For Hire

5  Doctrine.  According to Defendants' logic, Adler created the latter two ZeroForum Versions (i.e.,

6  2.0.6c and 2.1.2) as "works made for hire" while working as a RelyNet employee, which vests

7  authorship in RelyNet rather than Adler, the actual author.  As Plaintiff discusses more fully below,

8  the evidence in this case and Ninth Circuit case law defy such a conclusion – RelyNet cannot gain

9  ownership of the entire ZeroForum platform if, assuming *arguendo*, only a miniscule segment of the

10  software was created "for hire".  A brief overview of the work for hire Doctrine follows.

11      The Copyright Act accords careful treatment to works made for hire, in part because

12  classifying a work as "made for hire" has profound significance for independent creators – who by

13  way of such classification may lose ownership in their original works of authorship. *Community For*

14  *Creative Non-Violence et al. (CCNC") v. Reid*, 490 U.S. 730, 737 (1989).  When a work is deemed

15  "made for hire," the employer – rather than the actual author – is considered the author for copyright

16  purposes, and authorship vests automatically in the employer.  *CCNV v. Reid,* 490 U.S. 730.  Thus,

17  §101 of the Copyright Act explicitly provides that a work is "made for hire" under only two sets of

18  circumstances: (1) where the work is prepared within the scope of employment; or (2) where the

19  work is specially ordered or commissioned for use in one of the nine categories designated for such

20  works.  *CCNV v. Reid, supra, 490 U.S. 730 at 738.*  The dispositive inquiry in this case is whether

21  Plaintiff Dustin Adler has relinquished to Defendant RelyNet his copyrights in the ZeroForum

22  software – as works made for hire in the scope of his employment as a RelyNet employee.

23      It is undisputed – and key to this analysis – that Plaintiff brought pre-existing ZeroForum

24  source code to RelyNet in 2003, which Plaintiff exclusively authored and optimized well before

25  becoming a RelyNet employee/co-owner.  It is also undisputed that this pre-existing ZeroForum

26  source code (ZeroForum 2.0.5a Siva) comprises approximately 95% of the ZeroForum software at

27  issue in this case – it is literally the "base code" foundation for all subsequent ZeroForum updates

28  that Plaintiff authored as a RelyNet employee/co-owner.  Thus, the core question in probing "work

made for hire" applicability here is whether Plaintiff, the indisputable copyright owner of the ZeroForum base code, forfeited his copyrights in that pre-existing base code by preparing updates to the base code as a RelyNet employee.  Put another way, assuming *arguendo* that the ZeroForum updates (i.e., ZeroForum 2.0.6c and 2.1.2) are "works made for hire", does copyright ownership in the base code (i.e., ZeroForum 2.0.5a Siva) automatically transfer from Dustin Adler (as employee) to RelyNet (as  employer)?  The answer is no.

### 3.    Creating A Derivative Work As A "Work Made For Hire" Does Not Entitle The Employer To Ownership Of The Pre-Existing Work

This issue is not new to copyright law – and its resolution is not complicated.  The tension between employees and employers over derivative "works made for hire" incorporating pre-existing copyrighted material gives way to common sense, fairness and equity.  The law does not permit an employer to bootstrap copyright ownership of pre-existing material (created outside the scope of employment) to ownership of material in a derivative work – even  if the derivative work was created as a "work-made-for-hire."  *1 Nimmer on Copyright* §5.03[B][1][b][i] at 5-33 n. 92 (citing *Siegel v. National Periodical Publications, Inc.*, 508 F.2d 909 (2nd Cir. 1974).)  An employer who claims ownership of a derivative work as "made-for-hire" is not entitled to ownership of the pre-existing work, which was created outside of the employment relationship.  *1 Nimmer on Copyright* §5.03[B][1][b][i] at 5-33.  As one court has said:

> *No one sells or mortgages all the products of his brain to his employer by the mere fact of employment.*

*Pavlica v. Behr,* 397 F.Supp.2d 519. 525 (S.D.N.Y. 2005).  Thus, the literary efforts of an employee, if not rendered within the scope of his or her employment, remain the property of the employee.  *1 Nimmer on Copyright* §5.03[B][1][b][i] at 5-33 n. 92 (citing *Siegel v. National Periodical Publications, Inc.*, 508 F.2d 909 (2nd Cir. 1974) (earlier version of Superman created prior to employment relationship held not owned by employer); *Scherr v. Universal Match Corp.*, 417 F.2d 497 (2nd Cir. 1969).)

The well-known *Superman* litigation is on point and illustrative regarding an employer's ownership of preexisting works incorporated into derivative works, where the derivative works are

1    created as works made for hire.  See, *Siegel v. National Periodical Publications, Inc.*, 508 F.2d 909

2    (2nd Cir. 1974); *Siegel v. Warner Bros. Entertainment, Inc. et al.*, 542 F.Supp.2d 1098, 1127 (C.D

3    Cal. 2008).   This series of cases involves an epic battle for copyright ownership in the famous

4    Superman character, which was originally created and illustrated by Jerome Siegel and Joseph

5    Shuster in 1933, well before the two artists became employees of Defendant Detective Comics in

6    1937.

7          In the 1974 case, Defendants claimed ownership of the Superman copyrights, arguing that

8    Superman was a work made for hire, which entitled Defendants (i.e., the employer) to all

9    corresponding copyrights.  *Siegel v. National Periodical Publications, Inc.*, 508 F.2d 909 at 912.

10   The Second Circuit summarily rejected Defendant's line of argument, emphasizing that

11          "[S]uperman and his miraculous powers were completely developed long before
12          the employment relationship was instituted.   The record indicates that the
             revisions directed by the defendants were simply to accommodate Superman to a
13          magazine format.  We do not consider this sufficient to create the presumption
             that the strip was a work for hire."
14

15   *Id.*  However, based on the author's assignments to Defendants – and only on that ground – the

16   Court concluded that Plaintiff's were precluded "from contesting ever again that all rights in

17   Superman, including the renewal copyrights, have passed forever to Defendants." *Id.* at 914.

18          But, as fate would have it, subsequent changes in copyright law resurrected legal questions

19   regarding ownership rights to the Superman copyrights.  *Siegel v. Warner Bros. Entertainment, Inc.*

20   *et al.*, 542 F.Supp.2d at 1113.  With passage of the 1976 Copyright Act, artists (and their heirs) were

21   given the ability to terminate prior copyright grants, regardless or previous assignment or other

22   contractual terms – *except where works are made for hire.*[3]  Thus, in 2008 the Central District of

23   California revisited the Superman litigation and Defendants, again, argued that Superman and related

24   derivative works were "made for hire".  *Id.* at 1127.  More specifically, Defendants argued that the

25   "additional material" added to the pre-existing Superman character "for hire" comprised "color

26   _____
27   [3] Under the 1976 Act, an author's (or heirs') ability to terminate a prior copyright grant does not
     apply to a "work made for hire" because the copyright in such a creation was never the artist's to
     grant, belonging instead to the one who employed the artist to create the work.  *Siegel v. Warner*
28   *Bros. Entertainment, Inc. et al.*, 542 F.Supp.2d at 1126-1127.

1   choices made throughout the comic, notably the red color of the letter 'S' on Superman's crest and the

2   art work for the cover to the magazine itself' and additional pictures to illustrate story continuity",

3   which transformed the publications into "works made for hire." *Id.,* at 1127.

4       The Central District's ruling delineates the copyright ownership status of derivative works

5   created in a "for hire" scenario. *Id.* at 1128-1129.  According to Professor Nimmer:

6       The [Second Circuit's] *Siegel* decision … may be understood as holding that the first
7       expression of the Superman character was the underlying work, and the later development of
        the character was a derivative work.  Because only the derivative work was produced in a for-
8       hire relationship, the underlying work remains the property of the creators.

9   *Id.* at 1129 (citing 1 Nimmer On Copyright §5.03[B][1][b][i].  "After seventy years, Jerome Siegel's

10  heirs regain what he granted so long ago – the copyright in the Superman material that was

11  published in Action Comics" originally in 1938.  *Id.* at 1145.

12      This case law and esteemed commentors make clear that copyright ownership subsists in the

13  author of an original pre-existing work that is subsequently incorporated into a derivative work – and

14  the underlying copyright for that pre-existing work provides a basis for liability if the derivative

15  work is copied without the original author's authorization.  *See also Russell v. Price*, 612 F.2d 1123,

16  1128-1129 (9th Cir. 1979) (holding that "unauthorized copying or other infringing use of the

17  underlying work or any part of that work contained in the derivative product is prohibited so long as

18  the underlying work itself remains copyrighted:"); *Montgomery v. Noga*, 168 F.3d 1282 (11th Cir.

19  1999) (upholding a copyright claim based on copying of an unregistered, second version of software

20  containing over seventy percent of the source code from the original version in which the copyright

21  claimant owned a registered copyright.)

22      In *Montgomery,*, the Eleventh Circuit squarely addressed the issue of whether the owner of a

23  copyrighted preexisting computer software program can successfully sue for infringement of an

24  unauthorized derivative work, which incorporated his preexisting source code.  *Montgomery v.*

25  *Noga*, 168 F.3d 1282 (11th Cir. 1999)  Like the case at bar, the Plaintiff Robert Montgomery

26  developed the base source code for a computer program, in addition to multiple updates that were

27  built upon the his base code software.  168 F.3d 1282, 1286.  However, Plaintiff only registered the

28  copyright for his version 2.9a base code – and failed to timely register copyrights in subsequent

1   updated versions, including his Version 4.3. *Id.* at 1287 n. 3. It is unregistered update Version 4.3

2   (incorporating registered version 2.9a), which Defendants admittedly copied. Defendants argued

3   that Plaintiff's failure to register this updated version obviated Plaintiff's claim for copyright

4   infringement. *Id.* at 1292.

5           The Eleventh Circuit rejected Defendants' argument in its entirety. According to the Court,

6   "[t]he evidence at trial showed that [uncopyrighted Version 4.3] incorporated over seventy percent

7   of the original source code from the registered [Version 2.9a], and that [unregistered Version 4.3]

8   would not function if [base code Version 2.9a] was removed. By downloading [Version 4.3] and

9   incorporating it as a utility on [Defendants' unauthorized CDs], defendants infringed [Plaintiff's]

10  registered copyrights in [Version 2.9a] within the meaning of Section 501(a) of the Copyright Act."

11  *Id.* at 1292 (citing 17 U.S.C. §501(a), ("[A]nyone who violates any of the exclusive rights of the

12  copyright owner as provided by sections 106 through 118 … is an infringer of the copyright ….");

13  17 U.S.C. §106(1)-(2) 1994), (noting that a copyright owner has the exclusive right to do and to

14  authorize both reproductions of the copyrighted work in copies and preparation of derivative works

15  based upon the copyrighted work); H.R. Rep. No. 94-1476, at 61 (1976), *reprinted in 1976*

16  *U.S.C.C.A.N. at 5675* ("[T]he exclusive right to prepare derivative works, specified separately in

17  clause (2) of section 106, overlaps the exclusive right of reproduction [in section 106(1)] to some

18  extent …. To constitute a violation of section 106(2), the infringing work must incorporate *a portion*

19  *of* the copyrighted work in some form. Such infringement is actionable under section 501(b) (1994)

20  (emphasis in original).)" *Id.* at 1292.

21          Adler created ZeroForum 2.0 from home, while unemployed and using his own equipment.

22  In addition, Adler created and coded ZeroForum 2.0.5a Siva (a derivative work of ZeroForum 2.0) in

23  his spare time on the side while he worked as an independent contractor for GDT-Nova. Adler's

24  Copyright Registration for ZeroForum 2.0.5a Siva (TX 6-210-247) clearly indicates that ZeroForum

25  2.0.5a Siva incorporates the ZeroForum 2.0 code. Together, ZeroForum 2.0 and ZeroForum 2.0.5a

26  Siva comprise the preexisting base code for all subsequent ZeroForum updates, and constitute 95%

27  of the ZeroForum source code that was incorporated into versions 2.0.6c and 2.1.2. Adler's

28  preexisting base code drives 95% of ZeroForum's functionality.

-10-

TRIAL BRIEF

1    Both ZeroForum 2.0.6c and ZeroForum 2.1.2 are technical updates to the ZeroForum

2    platform, and involve simple modifications such as bug fixes, additional bells-and-whistles, or

3    tweaking functionality to address an isolated glitch.    At all times relevant to this case, it was

4    understood that Adler created and owned ZeroForum – not Defendants DiCarlo or RelyNet.  Former

5    RelyNet employee Layton Wedgeworth testified that he always viewed ZeroForum as belonging to

6    Adler because Adler originally created the source code.  Defendant DiCarlo has specifically testified

7    that his purported contribution to the ZeroForum Software source code was de minimus (at best) and

8    only constituted approximately 100 lines out of literally thousands of lines of source code

9    comprising the ZeroForum Platform.

10    It is axiomatic that Adler retains exclusive authorship and ownership in the underlying base

11    code for his ZeroForum platform (i.e., ZeroForum 2.0 and ZeroForum 2.0.5a Siva).  Adler created

12    this base code well before becoming a RelyNet employee,    which obviates a work made for hire

13    application for these respective works because Adler was not cognizably at "work" or under "hire"

14    with RelyNet when the base code was created.  The only two ZeroForum versions that Defendants

15    can even attempt to argue as works made for hire are those Adler updated while working as a

16    RelyNet co-owner (i.e., ZeroForum 2.0.6c and ZeroForum 2.1.2.)  However, both of these works

17    contain Adler's base code for ZeroForum and constitute minor technical updates to the software.

18    Adler's Copyright Registration Certificates corroborate this fact.  Indeed, TX 6-210-248 (ZeroForum

19    2.0.6c) expressly identifies ZeroForum 2.0.5a Siva and ZeroForum 2.0 (i.e., the base code) as

20    "preexisting material" incorporated into ZeroForum 2.0.6c.  Likewise, TX 6-210-249 (ZeroForum

21    2.1.2) expressly identifies Adler's ZeroForum base code and ZeroForum 2.0.6c as "preexisting

22    material" incorporated into ZeroForum 2.1.2.    The minor updates are like building blocks, built on

23    the foundation of Adler's ZeroForum 2.0 and 2.0.5a Siva base code.

24    Adler has neither assigned nor otherwise transferred his copyright ownership in the base code

25    to DiCarlo, RelyNet or anyone else.  Thus, unauthorized reproduction of ZeroForum 2.0.6c and

26    ZeroForum 2.1.2, derivative works containing Adler's base code in its entirety, constitutes actionable

27    infringement based on a long line of case precedent as discussed above.

28    / / /

TRIAL BRIEF

1

2

**4.      Defendants Commercially Sold Unauthorized Derivative Works Containing Adler's ZeroForum Base Code, Which Constitutes Classic Copyright Infringement**

3

4

5

6

7

8

9

If a pre-existing work that serves as the basis for a derivative work is itself protected by copyright, then its unauthorized incorporation into a derivative work constitutes copyright infringement.[4]  1 *Nimmer On Copyright* §3.06 at 3-34.30 (citing *Szekely v. Eagle Lion Films, Inc.*, 140 F.Supp.843 (S.D.N.Y. 1956); *Douglas Int'l Corp. v. Baker*, 335 F.Supp. 282 (S.D.N.Y. 1971); *Cortner v. Israel,* 732 F.2d 267 (2nd Cir. 1984.)   In order to constitute infringement, the unauthorized derivative work must be "substantially similar" to the underlying, preexisting work.  *1 Nimmer On Copyright* §3.06 at 3-34.30 n.3.  In the Ninth Circuit:

10

11

12

[A] 'derivative work' under the Copyright Act is one which would be considered an infringing work if the material which it has derived from a preexisting work had been taken without the consent of the copyright proprietor of such preexisting work.

13

14

Accordingly, if a new work is derived from a previous work, and the new work thereby infringes a copyright in the previous work, then the new work is an unauthorized (and infringing) derivative work.

15

16

17

18

19

20

21

22

23

24

25

*Sobhani v. @Radical.Media, Inc.*, 257 F.Supp.2d 1234, 1238 (C.D. Cal. 2003) (citing *Mirage Editions, Inc. v. Albuquerque A.R.T. Co.*, 856 F.2d 1341 (9th Cir. 1988), quoting 1 *Nimmer On Copyright* §3.01 (1986.)   Where the preexisting work is the subject of a valid copyright, "[i]t's unauthorized use constitutes classic infringement" and is therefore unlawful under the Copyright Act.  *Sobhani v. @Radical.Media, Inc.*, supra, 257 F.Supp.2d at 1239, 1240 (holding that Plaintiff's series of television commercials, which incorporated excerpts of prior Jack-in-the-Box advertisements and caricatures from the movie *Cast Away* constituted unauthorized, infringing derivative works that were not entitled to any form of copyright protection – because the copyrighted work "pervaded" the so-called derivative work); *Eden Toys v. Florelee,* supra, 697 F.2d 27 at 34 (finding that producing a derivative work based on preexisting copyrighted material, without the

26

27

---

[4] More specifically, incorporating a copyrighted preexisting work into a derivative work, without permission, violates the statutory right to prepare derivative works based upon the preexisting work. *1 Nimmer On Copyright* §3.06 at 3-34.30.

28

1   copyright owner's consent, invalidates such derivative works where the copyrighted material "tends

2   to pervade the entire derivative work.")

3          a.   **The ZeroForum Software Defendants Ultimately Sold To Internet Brands Is An Unauthorized Derivative Work Of Plaintiff's ZeroForum Software – And Constitutes Classic Copyright Infringement**

4

5          After DiCarlo locked Adler out of the RelyNet facilities in August 2005, Adler's counsel sent

6   Defendants cease and desist correspondence dated October 21, 2005, in which Adler requested that

7   Defendants completely discontinue use of Adler's copyrighted ZeroForum Software.  (Trial Exhibit

8   122.)   In correspondence dated December 29, 2005, Defendants' counsel expressly stated that

9   Defendants would completely discontinue its ZeroForum use and migrate onto an entirely different

10  software platform.  (Trial Exhibit 127.)  However, Defendants surreptitiously continued licensing

11  ZeroForum commercially – and nearly two years later, in February 2007, ultimately sold ZeroForum

12  to Internet Brands via  the February 15, 2007 Asset Purchase Agreement ("APA") for $2.7 million.

13  (Trial Exhibit 159.)

14         It is beyond credible dispute that the ZeroForum Software Defendants continued to use

15  commercially, and ultimately sold to Internet Brands, expressly incorporates Adler's copyrighted,

16  preexisting ZeroForum 2.0.5a Siva source code (i.e. the base code) without Adler's consent.  Indeed,

17  Adler's 2.0.5a Siva base code, which Adler authored from home while unemployed, accounts for

18  approximately 95% the ZeroForum Software code Defendants used and sold for commercial gain

19  after Adler's October 2005 cease and desist request.  The evidence at trial will show, indisputably,

20  that Defendants received a windfall of profits as a direct result of selling Plaintiff's ZeroForum

21  Software.  Such evidence will include the following key points:

22         ►   Defendants expressly concede that Adler "completed [coding ZeroForum 2.0.5a Siva]
23             before becoming a salaried employee of RelyNet."  *Defendants Reply Brief In Support Of Defendants' Motion For Summary Judgment Or Summary Adjudication* ("Defs'. Summary Judgment Reply Brief") at 6:10-11.
24

25         ►   Defendant DiCarlo expressly testified that only minor updates were added to Adler's
26             ZeroForum 2.0.5a Siva base code after Adler joined RelyNet – and that the base code remained relatively unchanged from its original form.

27         ►   Defendants expressly concede that ZeroForum 2.0.6c and 2.1.2, which Defendants
               claim are works made for hire, "indisputably are derivative of version 2.0.5a Siva
28             [i.e., Adler's base code]".  *Defs'. Summary Judgment Reply Brief* at 6:21-21.

1    ►    It is undisputed that the ZeroForum version Defendants continued to use and sell commercially after Adler's October 2005 cease and desist request is essentially
2          identical to Adler's ZeroForum 2.0.5a Siva base code.

3    ►    It is undisputed that Adler has never assigned or otherwise transferred his ownership in ZeroForum versions 2.0.5a Siva, 2.0.6c and 2.1.2 to DiCarlo, RelyNet, or anyone
4          else.

5    ►    It is undisputed that Defendants' continued commercial use and sale of ZeroForum after October 2005 was expressly without Adler's consent.

6

7          On these facts the record is clear – in the Ninth Circuit, Defendants' conduct constitutes

8    "classic" copyright infringement.

9              **b.    The LiveTopic Software That Defendants Advertise And License To**
                      **Consumers Is An Unauthorized Derivative Work Of Plaintiff's**
10                    **ZeroForum Software – And Constitutes Classic Infringement**

11         In or about 2007-2008, RelyNet semantically changed the  name of its bulletin board

12   software from ZeroForum to LiveTopic.   However, substantively, the LiveTopic source code is

13   structurally and functionally identical to Adler's ZeroForum base code.   Here too, the record is clear.

14   Neither DiCarlo nor RelyNet can successfully refute the fact that   LiveTopic   contains   nearly   the

15   exact same source code as the ZeroForum Software.   [DiCarlo Depo. Pp. 192-95]

16   **C.    ADLER DID NOT CREATE ZEROFORUM AS A WORK MADE FOR HIRE**
           **OWNED BY RELYNET – ADLER CREATED THE BASE CODE ON HIS HOME**
17         **EQUIPMENT WHILE WORKING AS AN INDEPENDENT CONTRACTOR FOR**
           **GDT-NOVA.**
18
                      Adler's ZeroForum Software Is Not A Work Made For Hire – Adler Created ZeroForum
19                    Independently, Without Any Supervision Or Substantive Input From Defendant DiCarlo
                      Or Anyone Else
20

21         It bears repeating that classifying a work as "made for hire" has profound significance for

22   independent creators – including artists, writers and computer programmers – who, by way of such

23   classification, may be divested of ownership in their original works of authorship.   *Community For*

24   *Creative Non-Violence et al.("CCNV") v. Reid* 490 U.S. 730, 737 (1989.)   Thus, only two narrowly

25   tailored fact scenarios justify a work made for hire classification, and only one of which is relevant

26   to this case (i.e., whether Adler's ZeroForum software was prepared by Adler as a RelyNet employee

27   "within the scope of [his] employment" under §101(1).   See *CCNV v. Reid, supra,* 490 U.S. 730 at

28   738.  Neither the facts of this case nor controlling case authority warrant such a finding.

1

2

      **1.**     **Adler Was Not A RelyNet Employee Within The Meaning Of** *Creative Non-Violence v. Reid*

3

4

5

6

     To determine whether a work is "for hire" under the Copyright Act, a court first should ascertain, using principles of the general common law of agency, whether the work was prepared by an employee or an independent contractor. *Id.* at 751  After making this determination, the court can apply the appropriate subsection of §101. *Id.*

7

8

9

10

11

12

13

14

15

16

17

     A party's *control* over the creation of a work is a touchstone of establishing an employment relationship for "work for hire" analysis.   Thus, in determining whether a hired party[5] is an employee of the hiring party[6] under the general common law of agency, courts consider the hiring party's *right to control* the manner and means by which the product is accomplished.  *Id.*  Among the other factors relevant to this inquiry are: "the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party." *Id.* at 752.  No one of these factors is determinative. *Id.*

18

19

20

21

22

23

     In *CCNV v. Reid*, the United States Supreme Court examined these factors in light of the relevant facts and found that Reid, the "hired party" who created the disputed sculptural work, was *not* an employee under the Copyright Acts work for hire provisions. *Id.* at 752.   Although the "hiring party" in this case (i.e., CCNV) did exercise some control over Reid's work to ensure that Reid produced a sculpture that met their specifications, all of the other factors "weighed heavily against finding an employment relationship." *Id.*  The Court's analysis in this regard is succinct:

24

25

26

27

     Reid is a sculptor, a skilled occupation.  Reid supplied his own tools.  He worked in his own studio in Baltimore, making daily supervision of his activities from Washington practicably impossible.  Reid was retained for less than two months, a relatively short period of time.  During and after this time, CCNV had no right to assign additional projects to Reid.  Apart from the deadline for completing the sculpture, Reid had absolute freedom to decide when

28

---

[5] Hired party means the party who actually crated the work of authorship.

[6] "Hiring party" means the party claiming ownership of the disputed work via work made for hire.

1  and how long to work.  CCNV paid Reid $15,000, a sum dependent on "completion of a
2  specific job, a method by which independent contractors are often compensation …. Finally,
   CCNV did not pay payroll or Social Security taxes, provide any employee benefits, or
3  contribute to unemployment insurance or workers' compensation funds.

4  *Id.* at 752-53.  CCNV therefore could not satisfy the employment relationship prong of the §101

5  work for hire provision.  *Id.* at 753.  Neither could CCNV satisfy the "commissioned work" prong of

6  §101, which requires a written instrument expressly stating that the work is "for hire".  *Id.*

7      **2.**    **Adler Created ZeroForum 2.0 And ZeroForum 2.0.5a Siva – The Platform Of**
                      **All Subsequent ZeroForum Updates – From Home, Using His Own Equipment**
8                     **And While Unemployed**

9      Adler's evidence against a work for hire finding is even more compelling than Reid's

10  evidence was in the *CCNV* case.  As distinguished from *CCNV v. Reid*, neither DiCarlo nor RelyNet

11  had any control over Adler's creation of ZeroForum 2.0.5a Siva or its predecessor ZeroForum 2.0,

12  which signals the absence of a cognizable employment relationship.  Plaintiff is a skilled computer

13  programmer – and had worked as such for over 9 years before writing the ZeroForum source code.

14  When creating and coding ZeroForum 2.0.5a Siva and its predecessor ZeroForum 2.0, Adler worked

15  from home used his own equipment, and had no technical input from either DiCarlo or RelyNet.  In

16  fact, Adler worked as a Form 1099 independent contractor (software programmer) for a company

17  called GDT-Nova during the time period in 2002 when he wrote and completed ZeroForum 2.0.5a

18  Siva.  DiCarlo was admittedly technically incapable of even understanding how Adler coded the

19  ZeroForum software.  Adler was not retained by DiCarlo or RelyNet to create ZeroForum – Adler

20  created ZeroForum as a hobby and out of his fondness for automotive innovation.  Also similar to

21  *CCNV v. Reid*, Adler had absolute freedom to decide when, where and how long to work – he

22  typically coded ZeroForum during the night and wee hours of the morning from his home.  Adler

23  had no deadline to complete ZeroForum – he was motivated to complete coding by his desire to

24  contribute to the automotive online forum world, and his need to hopefully use ZeroForum as a

25  source of income (since at that time Adler did not have a full-time job.)  Neither DiCarlo nor

26  RelyNet paid Adler one penny for creating ZeroForum 2.0 or ZeroForum 2.0.5a Siva – the base code

27  for the entire ZeroForum Platform.

28  / / /

1

2

      **3.**      **Adler Completed ZeroForum 2.0.6c and ZeroForum 2.1.2 – Both Of Which Are Derivative Works Of ZeroForum 2.0.5a Siva – Without Any Supervision Or Substantive Input By DiCarlo Or RelyNet**

3

4

5

6

7

8

9

10

11

12

13

      Adler commenced the ZeroForum 2.0.6c update in January 2003, after Adler and DiCarlo had formed an informal partnership with RelyNet, but before Adler and DiCarlo formalized their partnership later that month.  It was not until after Adler executed a W4 Form in late January 2003 (to further memorialize what Adler reasonably believed to be his status as a RelyNet co-owner) that Adler began to receive compensation from the partnership.  Adler subsequently coded ZeroForum 2.1.2 in 2005.  Adler continued to exercise exclusive control over ZeroForum development and updated ZeroForum as he saw fit – on his own volition.  Indeed, both DiCarlo and RelyNet former employee Layton Wedgeworth both testified to the fact that they, respectively, contributed very little, if any, to ZeroForum's content or functionality.  Adler decided when – and how – to update ZeroForum periodically and received no directives from anyone in this regard.  Layton Wedgeworth believed that ZeroForum was Adler's exclusive property.

14

15

16

17

18

19

20

21

22

23

      Adler did not begin to receive regular compensation from RelyNet until January 2003, after executing a W4 Form.  Even then, his compensation was not related to ZeroForum (or other software) development.  Adler was paid as a co-owner of the RelyNet company (not as a software developer) as demonstrated by compensation parity with the other co-owner (Defendant DiCarlo) and other compelling indicia of co-ownership, including joint hiring and decision-making authority and access to RelyNet's corporate records.  Moreover, Adler's receipt of compensation is merely one factor in evaluating whether an author is an "employee" within the meaning of the Copyright Act's work for hire provisions – and that fact alone is not determinative.  *CCNV v. Reid*, *supra*, 490 U.S. at 752.  The balance of the remaining *CCNV v. Reid* factors militate strongly against finding that Adler's ZeroForum 2.0.6c update should be classified as a work for hire.

24

25

26

27

28

      Nonetheless, assuming for the sake of argument – and only for the sake of argument – that Adler is classified as a RelyNet employee when he created the ZeroForum 2.0.6c and ZeroForum 2.1.2 updates – those version are derivative works of ZeroForum 2.0 and ZeroForum 2.0.5a Siva (the base code).  The pre-existing platform code in ZeroForum 2.0 and ZeroForum 2.0.5a Siva remains

/ / /

TRIAL BRIEF

1   the exclusive copyright protected intellectual property of Plaintiff Dustin Adler, which Adler has

2   never assigned or otherwise transferred.

3   **D.   PLAINTIFF DID NOT RELINQUISH HIS COPYRIGHT OWNERSHIP IN THE ZEROFORUM SOFTWARE – DEFENDANTS' HODGEPODGE OF "RELINQUISHMENT" THEORIES IS BELIED BY UNDISPUTED FACTS**

4

5          Defendants contend that they have no copyright infringement liability for their unauthorized

6   use and sale of Plaintiff's ZeroForum Software, because Plaintiff mysteriously - even voluntarily –

7   just "relinquished" his rights to ZeroForum.  Regardless of how many theories Defendants assert in

8   this regard, such a concept is contrary to the facts and applicable case authority – and defies logic

9   from a business perspective.

10          **1.   Waiver**

11          "Defendants do not argue that Adler abandoned his rights to the public; they argue that he

12   relinquished his rights to RelyNet, Inc., his employer, and thereby gave up his rights to sue RelyNet

13   for infringement."  *Defs'. Reply Brief In Support Of Motion For Summary Judgment Or Summary*

14   *Adjudication*, 8:13-16.  Defendants' argument is simply implausible.

15          Courts are reluctant to find copyright waiver and resulting loss of all copyright protection in

16   works, even where the copyright proprietor provides access to his copyright protected work and

17   allows others to use such works.  Such a drastic result should occur if, and only if, the copyright

18   owner clearly demonstrates his intent to relinquish copyright protection in the original works of

19   authorship "and allow the public to copy."  *National Comics Publications v. Fawcett Publication*,

20   191 F.2d 594, 598 (2nd Cir. 1951).  Thus, in the context of copyright law, waiver or abandonment of

21   copyright "occurs only if there is an intent by the copyright proprietor to surrender rights in his

22   work."  *A&M Records, Inc. et al. v. Napster, Inc.*, 239 F.3d 1004, 1026 (9th Cir. 2001 (emphasis

23   added).  A copyright owner's "relinquishment of such rights must be manifested by some overt act

24   indicative of a purpose to surrender rights in the original works of authorship.  *Hampton v.*

25   *Paramount Pictures Corp.*, 279 F.2d 100, 104 (9th Cir. 1960).

26          Defendants' waiver argument must fail for the following reasons:

27          ►      From the inception of providing ZeroForum commercially, Adler personally added the
                  following line to the Software source code header – "This is commercial software.

28                Unlicensed use is prohibited."

►    When third party RelyNet customers requested access to the ZeroForum source code for prospective product development, Plaintiff told Defendant DiCarlo that Plaintiff *absolutely* would not make the ZeroForum source code publicly available to anyone – under any circumstances.

►    In numerous meetings between Plaintiff and Defendant DiCarlo, including meetings that took place in March 2005, Plaintiff expressly stated to DiCarlo that the ZeroForum Software belongs to Plaintiff – and that Plaintiff could take ZeroForum and leave RelyNet to pursue other business ventures.

►    In correspondence dated October 21, 2005 Plaintiff expressly requested that Defendants cease-and-desist all use of his copyrighted ZeroForum software:

►    In correspondence dated December 29, 2005, Defendants agreed to discontinue using the ZeroForum Software

The thought of "relinquishing" his copyright ownership in the ZeroForum software never entered Plaintiff's mind – and certainly was not manifest by either Plaintiff's or Defendant's actions.

### 2.    Adler Has Not Granted Defendants An Implied License In Perpetuity To Use ZeroForum – And Any Perceived License Was Expressly Revoked In 2005

An implied license to use a copyrighted work is granted when "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, [fn. omitted] and (3) the licensor intends that the licensee-requestor copy and distribute his work. [citations]" The relevant intent is the licensor's objective intent at the time of creating and delivering the work, as manifested by the parties' conduct. *Asset Marketing Systems, Inc. v. Gagnon,* 542 F.3d 748, 754, 756 (9th Cir. 2008) The *Gagnon* court coins the foregoing analysis the *Effects* test based upon its earlier decision in *Effects Assocs., Inc. v. Cohen,* 908 F.2d 555, 558 (9th Cir.1990). *Id.* For the following reasons, Defendants cannot establish a cognizable implied license to use Plaintiff's ZeroForum Software without Plaintiff's express consent:

►    Defendants did not "request" that Plaintiff create ZeroForum, as required by prong 1 of the *Effects* test. Rather, it was Plaintiff who, early in the year 2000, approached Defendant DiCarlo and proposed the concept of using RelyNet servers to host the Honda-Acura.net website powered by ZeroForum. Neither even contemplated a business relationship at this point.

►    Plaintiff did not "create" ZeroForum for Defendants DiCarlo or RelyNet as required by prong 2 of the *Effects* test. This was Plaintiff's and Defendant's hobby – demonstrated by the fact the Plaintiff created the initial ZeroForum base code while primarily unemployed, during his free time, from home using his own personal electronic equipment. At the time, Defendant DiCarlo was still a full-time Intel

-19-

TRIAL BRIEF

1    employee.  Plaintiff received no compensation creating ZeroForum.

2    ►    The "intent" prong of the *Effects* test absolutely bars Defendants from establishing an implied license for ZeroForum.  Adler's "objective intent" when initially creating ZeroForum was to ply his hobby as an automobile enthusiast.  Evidence comprising chat log conversations between Plaintiff and Defendant DiCarlo during the time Plaintiff was creating ZeroForum will bear this point out with clarity.

5    Moreover, any such implied license was expressly revoked in October 2005 when Plaintiff

6    requested that Defendants cease and desist from using ZeroForum.  Thus, Defendants' 'implied

7    license" theory of Plaintiff's copyright relinquishment is inconsistent with demonstrable facts and

8    controlling case authority on this issue.

9    **3.    Defendants' Estoppel Argument Is Indefensible**

10    Defendants' so-called evidence for its estoppels theory of relinquishment "is the same as for

11    the waiver and implied license defense [sic]."  *Defs'. Reply Brief In Support Of Motion For Summary*

12    *Judgment Or Summary Adjudication*, 9:11-12.  Thus, Plaintiff will not belabor the points previously

13    discussed.

14    Four elements must be present to establish the defense of estoppel: (1) The party to be

15    estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act

16    that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be

17    ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.  *Hampton v.*

18    *Paramount Pictures, supra* 279 F.2d 100, 104 (citing *California State Board of Equalization v.*

19    *Coast Radio Products*, 228 F.2d 520, 52 (9th Cir. 1955.)  Defendants' estoppels argument must fail

20    for Defendants' inability to demonstrate, with credible evidence, the four required elements.

21    ►    First, Plaintiff has retained and enforced his ZeroForum ownership and copyrights from the inception of ZeroForum creation.  Plaintiff never expressly or impliedly delivered ZeroForum to Defendants with the intent of transferring his ZeroForum ownership to Defendants.  Conversely, the evidence will show that Plaintiff consistently and openly informed Defendant DiCarlo that ZeroForum belongs to Plaintiff – as sole author – and that Plaintiff would never authorize ZeroForum source code access to anyone without Plaintiff's express consent.

25    ►    Second, neither Defendants nor RelyNet customers had a reasonable basis to believe that RelyNet, rather than Plaintiff, owned ZeroForum or had unlimited rights to use the software.  Indeed, the evidence will show that Defendants, as well as the online community, correctly acknowledged that Plaintiff – not DiCarlo or RelyNet – owned ZeroForum.  Former RelyNet employee Layton Wedgeworth will testify at trial in this regard.

28

1
2

►     Third, Defendant DiCarlo has known and acknowledged – for the inception of ZeroForum creation – that Plaintiff maintained ownership in the ZeroForum software. The evidence on this point is robust and indisputable.

3
4
5
6

►     Fourth, notably absent from Defendants' estoppel argument is any mention of a cognizable "injury" due to Plaintiff's conduct.  The fact of the matter is that Defendants have not suffered – but rather have gained significant revenue – from Plaintiff's ZeroForum software.  Without paying Plaintiff one dime in consideration, Defendants have generated significant licensing revenue from Plaintiff's ZeroForum Software and ultimately sold the Honda-Tech.com website "Powered By ZeroForum" for $2.7 million.

7

Defendants' estoppels argument cannot stand in light of these facts.

8
9

**E.**     **DEFENDANTS CANNOT SATISIFY THE SPECIFIC INTENT REQUIREMENT OF PENAL CODE SECTION 502 – WHICH OBIVIATES DEFENDANTS' CORRESPONDING CLAIM**

10

Penal Code Section 502 is a specific intent statute.  Penal Code section 502(c)(1) punishes a

11

person for a variety of types of misconduct involving the unauthorized access of computer systems,

12

including a person who "[k]nowingly accesses and without permission alters, damages, deletes,

13

destroys, or otherwise uses any … computer system … in order to either (A) devise or execute any

14

scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money,

15

property, or data." *Crawford v. City Of Los Angeles*, 175 Cal.App.4[th] 249, 255 (2009).

16

The evidence at trial will show that Plaintiff did not – and had no logical reason to – act with

17

the requisite intent under this statute.  At the time in question when Plaintiff allegedly accessed the

18

ZeroForum Software with destructive intent (June-July 2005), Plaintiff reasonably believed he was a

19

co-owner and equal partner of RelyNet.  Plaintiff reasonably believed that he had the right to access

20

RelyNet's computers as a co-owner and take reasonable steps to protect his rights in his ZeroForum

21

software and remove it from the RelyNet domain if his consent to use the software was terminated.

22

Thus, at issue with respect to his alleged violation of Section 502 is whether his access was

23

"unauthorized," "without permission," or to "wrongfully control or obtain money, property or data."

24

And, beyond the specific intent in those aspects, it must also be decided by the trier of fact whether

25

his actions were intended to "defraud, deceive, or extort."

26

Defendant's inability to establish the requisite specific intent required by Penal Code Section

27

502 at trial will obviate this claim in its entirety.

28

/ / /

TRIAL BRIEF

**F.    ADLER IS ENTITLED TO DAMAGES FOR DEFENDANTS' INFRINGEMENT OF ADLER'S ZEROFORUM COPYRIGHTS**

Plaintiff received no consideration for profits Defendants generated from selling unauthorized copies the ZeroForum software, and consequently is entitled to damages. Section 504(a) of the Copyright Act provides for two separate types of damages. A prevailing plaintiff may recover either actual damages plus any additional profits of the infringer; or statutory damages.

**1.    Adler Is Entitled To Actual Damages**

A prevailing copyright owner may recover both actual damages and any additional profits of the infringer attributable to the infringement. Copyright Act §504(b). Actual damages include any type of monetary damage that is proximately caused by the infringement. In addition to lost sales or lost fair market value of a work, the "value of an infringer's use" of a copyrighted work is a cognizable form of actual damages. *Brewer v. Hustler Magazine, Inc.*, 749 F.2d 527, 529 (9th Cir. 1984) (jury presumably computed "damages for value of use" by multiplying amount of royalty plaintiff received for one postcard under an agreement, by the number defendant's magazine issues sold containing infringing material). See also *Sid & Marty Krofft Tel. Prods. V. McDonald's Corp.*, 562 F.2d 1157, 1174; *Deltak, Inc. v. Advanced Systems, Inc.*, 767 F.2d 357, 360-61 (7th Cir. 1985); 3 *Nimmer On Copyright* §14.02[A].

In addition to actual damages, a copyright owner is entitled to recover an infringer's profits that are attributable to the infringement, so long as there is no double counting. Section 504(b) provides that in establishing an infringer's profits, Plaintiff need only prove Defendants' gross revenue. 17 U.S.C. §504(b). Defendants then have the burden of showing deductable expenses. 17 U.S.C. §504(b); *Russell v. Price*, 612 F.2d 1123 (9th Cir. 1979).

**a.    Plaintiff Is Entitled To Profits Defendants Generated By Selling The Honda-Tech.com Website And ZeroForum To Internet Brands In February 2007 For $2.7 Million**

In February 2007, Defendants sold certain assets to Internet Brands, Inc., as described in the Asset Purchase Agreement dated February 14, 2007 ("APA"). Those assets included the Honda-Tech.com website, which was "Powered by ZeroForum", existing content and existing technology. / / /

The APA with respect to the ZeroForum Software states that Internet Brands obtained a non-exclusive, perpetual license to the ZeroForum Software.

Plaintiff's Expert, Chris Whitaker, has testified that  about $2.4 of the $2.7 Million purchase price represents the value of the ZeroForum software, which was deployed to operate the Honda-Tech.com website.  Plaintiff intends to offer Mr. Whitaker's opinion, as testified in deposition, as to allocation of the $2.7 Million purchase price paid by Internet Brands.   Indeed, Mr. Whitaker's opinion in this regard is based upon, and corroborated by, an asset Valuation Report prepared by Duff & Phelps at the request of Internet Brands.  Defendants' realized profits of at least $2.4 Million from conveyance of the ZeroForum Software as documented in the APA.  Consequently, Plaintiff is entitled to recover those profits Defendants generated from the Internet Brands acquisition.

> **b.    Plaintiff Is Entitled To Damages and the Profits Defendants Generated By Selling ZeroForum Licenses To Multiple RelyNet Customers**

In addition to selling the HondaTech website and ZeroForum software to Internet Brands for $2.7 million, Defendants have generated significant licensing revenue from selling ZeroForum access to various commercial vendors, including companies such as Vortex Media Group and Intermedia Outdoors, Inc.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

TRIAL BRIEF

## IV. CONCLUSION

For the foregoing reasons, Plaintiff respectfully contends that Plaintiff's Claim for Copyright Infringement will prevail against Defendants at trial.


DATED:  January 15, 2010                    **MILSTONE, PETERSON & WATTS, LLP**
                                            *Attorneys at Law*


                                            By:_____/s/ GLENN W. PETERSON_____
                                                          GLENN W. PETERSON

                                            Attorneys for Plaintiff/Counterdefendant
                                            Dustin K. Adler


    I hereby attest that I have on file all holograph signatures for any signatures indicated by a "conformed" signature (/s/) within this e-filed document.

**MILLSTONE PETERSON & WATTS, LLP**
/s/ Glenn W. Peterson


DATED:  January 15, 2010                    **COSTELLO LAW CORPORATION**



                                            By:_____/s/ PAMELA WINSTON BERTANI____
                                                          PAMELA WINSTON BERTANI

                                            Attorneys for Plaintiff/Counterdefendant
                                            Dustin K. Adler


    I hereby attest that I have on file all holograph signatures for any signatures indicated by a "conformed" signature (/s/) within this e-filed document.

**COSTELLO LAW CORPORATION**
/s/ Pamela Winston Bertani

TRIAL BRIEF